## Case No. 490.

### In re ANTISDEL.

[18 N. B. R. 289.]

District Court, D. Michigan. April 29, 1878.

BANKRUPTCY—DISCHARGE— PROPER BOOKS OF AC-
COUNT — CONCEALMENT OF PROPERTY — RES JU-
DICATA.

[1. On objections to the discharge of a bank-
rupt, it appeared that his books of account were
kept in the ordinary form of books of coun-
try merchants, and that, although there might
be errors in posting, a trial balance could be
made with no extraordinary effort, and a com-
petent accountant, could gain a correct idea of
the bankrupt's business. *Held,* that the require-
ment as to keeping proper books was fully
met.]

[Cited in Re Vernia, 5 Fed. 725; Re Frey, 9
Fed. 384; Re Graves. 24 Fed. 554.]

[2. It appeared that certain erasures in such
books arose from errors in the original entries,
which were corrected by erasing the figures
and substituting the correct ones therefor, and
there was no suggestion of fraudulent intent.
*Held,* that a discharge would not be refused
because of such erasures.]

[Cited in Re Frey, 9 Fed. 382.]

[3. A member of a firm in embarrassed cir-
cumstances conveyed to his wife a large amount
of property, real and personal, constituting all
his individual property, at a time when a with-
drawal from his assets of this amount of prop-
erty was likely to embarrass him seriously in
meeting his obligations. He continued embar-
rassed, and became bankrupt. *Held,* that such
conveyance could not be upheld on the ground
that it was made in consideration of a loan
made to him by his wife 20 years before, and
which had been barred by the statute of limi-
tations for 14 years, and the omission from
his schedules of the property conveyed was
a concealment thereof, for which his discharge
might be refused.]

[4. A creditor of a bankrupt, having recov-
ered a judgment against him in a state court,
filed a creditor's bill against the bankrupt and
wife to have a conveyance by him to his wife
set aside as made in fraud of creditors. The
bill was dismissed upon the merits, and on ap-
peal to the supreme court the decree was af-
firmed. *Held,* that the creditor was estopped
to oppose the bankrupt's discharge, as the mat-
ter must be regarded as res judicata.]

[5. Creditors who have been duly notified of
a bankrupt's application for discharge, and make
no opposition, are regarded as consenting to the
discharge; and the court will only consider
whether the bankrupt has committed an act
which would bar a discharge, upon specifica-
tions regularly filed in opposition thereto, upon
which an issue can be joined, and the bankrupt
be heard in his defense, and will not of its own
motion refuse a discharge, though it may ap-
pear that such an act was committed by the
bankrupt.]

[Cited in Re Read, 5 Fed. 722.]

[In bankruptcy. Application by James S.
Antisdel a bankrupt, for discharge. On
specifications filed by the Union National
Bank, a creditor of the bankrupt, setting
forth objections to his discharge, as follows:
(1) That the bankrupt had willfully and in-
tentionally concealed his title to certain real
estate and personal property which belonged
to him, by having the same conveyed to his
wife at a time when he was insolvent, and
knew himself to be so, and when he expected
and contemplated proceedings in bankruptcy;
(2) that the bankrupt, being a country mer-
chant, did not keep proper books of account.]

John Atkinson, for bankrupt.

Alfred Russell, for objecting creditor.

BROWN, District Judge. Substantially
three objections are made to the bankrupt's
books of account. 1. That they did not ex-
hibit the condition of his business, that no
trial balance could be made from them, and
that Antisdel's individual account was un-
intelligible. 2. That there were unexplained
mutilations and erasures. 3. That he had
omitted to credit two or three small amounts,
and had made false entries of advances to
his wife.

With regard to the first objection, I fully
concur in the opinion of Judge Longyear in
the case of In re Archenbrown, [Case No.
505,] that the books of account of a merchant,
whatever be their form and number, must
be so kept as to give the creditors an in-
telligible idea of the business, and enable
a competent accountant to ascertain the debt-
or's financial condition. If that be done,
the form in which they are kept is of no im-
portance; but if it be not done, then it is
immaterial whether the omission was fraudu-
lent or otherwise. The evidence of the ex-
perts upon the subject is somewhat conflict-
ing—one testifying that a trial balance could
not be made, and three that it could be. The
books consist of a ledger, a cash-book, a
journal or day-book, and are kept in the form
in which the books of country merchants are
ordinarily kept. While there may be errors
in posting, which would prevent a balance
being obtained, upon the first trial, I am
satisfied that such balance could be obtained
with no extraordinary effort, and that from
an examination of these books a competent
accountant could gain a correct idea of the
bankrupt's business.

To sustain the second objection, I think
it should be made to appear that the mutila-
tions or erasures were fraudulent, and that
the ruling in the case of In re Archenbrown,
[supra,] above cited, extends no further than
to the form and nature of the books. In
re Beatty, [Case No. 1,196;] In re Pierson,
[Id. 11.153;] In re Burgess, [Id. 2,153.] There
are undoubtedly numerous erasures through
these books. but all of them seem to have
arisen from errors in the original entries,
subsequently corrected by erasing the fig-
ures, and writing the corrected ones over
them. There is not the slightest evidence
of a fraudulent intent.

The third objection. that certain credits to
which his customers were entitled were
omitted and certain false entries made, is
wholly unsupported by the testimony.

In support of the first specification, it was
proven that on the 6th of August, 1873, the
bankrupt conveyed directly to his wife, for
the nominal consideration of two thousand
dollars, about twenty acres of land in Union
City; that on 7th of February, 1872, he con-

veyed to one Decker several lots in the same village, which were afterwards and on the 23d of July, 1873, conveyed by Decker to the bankrupt's wife, for the nominal consideration of three hundred dollars, the bankrupt at the same time discharging a mortgage of two hundred and seventy-five dollars, which he had taken from Decker upon the sale to him. He subsequently made another conveyance to his wife of land in Sherwood, and on 1st of January, 1875, gave her a bill of sale of certain lumber and stone, originally designed for a house to be erected upon the same land. It appeared that in 1869 the bankrupt went into partnership with one Leonard, buying a half-interest in the business for ten thousand dollars, without taking an inventory, or knowing the financial condition of the firm, except as he had obtained certain impressions with regard to the business from his having been assessor of taxes the year before. He supposed the firm was worth twenty thousand dollars, but never knew the amount of the indebtedness until the administrator of his deceased partner took an inventory in the season of 1874, Leonard having died 5th of August, 1874. Leonard had attended to the financial part of the business, and sometimes the bills "seemed to crowd them," as he expressed it. In 1873, when Antisdel conveyed his land in Union City to his wife, he owed the Union City National Bank, the objecting creditor, two thousand dollars. He then knew the firm was in debt from fifteen thousand dollars to eighteen thousand dollars. He had no recollection whether they had run behind or not the first or second years, though he remembers that once or twice Leonard made the remark that they were behind, and had not made anything—had even lost. It appears, however, that the merchandise account exceeded the sales without counting any profits, and at the end of the first year showed a loss of about one thousand dollars. At the end of the second year the inventory showed a loss of two thousand dollars of stock, with all the profits. His partner then, being persuaded from the accounts that the profits of the year should be some six or seven thousand dollars more than paying for the goods, decided to dissolve the firm, to which Antisdel at first consented, but afterwards proposed to withdraw from taking an active part in the business, and put a clerk in his place. The next year showed a margin of one thousand six hundred dollars in the profits, and from thence to the day that Leonard was taken sick and left the store the business was in better condition. After March, 1874, the management of the store was in the hands of Antisdel until a settlement was made in September, when the administrator found that the purchases exceeded the sales some six thousand dollars. When the inventory was taken shortly after Leonard's death, the assets footed up about twenty-two thousand

dollars, and liabilities about eighteen thousand dollars. The bankrupt continued in business until March, 1875, when he sold out to one Watkins, the inventory at this time being about six thousand dollars. The debt of two thousand dollars to the Union City National Bank was contracted before the conveyances were made by the bankrupt to his wife. The property stood in Antisdel's name at the time the loan was made to the firm of which he was a member, August 27, 1872, and the fact of his possessing this property was undoubtedly some inducement for making the loan. It was then believed to be worth between four and five thousand dollars. Allen, cashier of the bank, remonstrated with Antisdel when he learned of the transfers through the newspapers, when Antisdel remarked he ought to let his wife have the farm. Antisdel afterwards said Allen had abused him, and probably that would be the last claim that would be paid. One Bostwick testified his wife had a mortgage on the firm property, and the payments were due semi-annually; that after Leonard's death payments were not made on the mortgage, and when Bostwick applied to Antisdel for payment, he said he could not pay it, that there was no company money to pay it with, and he didn't calculate to pay it with his own money. With regard to the personal property, one Scott testified that Antisdel took him to look at the lumber piled on the land in or near Union City, and asked him to buy it. He said he didn't want him to take the lumber and keep it, but he wanted him to take it; he wanted it for building purposes, and wanted him to give a note for it, and he would take it back and give up the note; they had got the lumber out for building a house and wanted to keep it for that purpose. That the firm of Leonard & Antisdel had got to pay their debts, and he did not propose that his private property should go to pay them. Scott recommended him to convey it to his wife. Antisdel doubted whether she could hold it from his creditors, but Scott thought she could if he owed her anything, and about a week after this he learned that Antisdel had given his wife a bill of sale for the lumber and stone. In defence it was shown that Mrs. Antisdel in 1850 let her husband have eight hundred dollars inherited from her father's estate, and in 1853 four hundred dollars from her grandfather's estate, but she took no security, and no memorandum of the loan was made by either party. It appears, however, that Antisdel had promised to make good these loans to his wife, though before 1866 he had owned two farms in his own name without securing the loan to her. In 1866 he bought twenty-five acres in Union City, with the understanding that it should be conveyed to his wife, and the deeds made in her name, but by an accident this was not done, and it was not until August 6, 1873, that he conveyed this property to his wife. No expla-

nation was given for the delay. In 1873 it was calculated that the one thousand two hundred dollars originally loaned amounted to about three thousand dollars, and these three conveyances were said to have been made in payment of this amount. The personal property consisted of building material intended for the house, which was upon the lot in 1873 when the conveyance of the land was made, and she agreed to take it at four hundred dollars, though the bill of sale was not made until January 1, 1875. Under Scott's testimony, however, I regard it as extremely improbable that any such agreement was made. Both parties testified that when these conveyances were made Antisdel believed himself entirely solvent, and had always met his paper at maturity. There is further testimony tending to show that his credit was good up to about the time of his bankruptcy, and there is no direct testimony that he was actually insolvent at the time they were made. He seems, however, to have been doing a losing business, had been pressed by his creditors, and if he were a man of ordinary business sagacity could hardly fail to have been aware that he had made a bad bargain in buying into the business, and that the partnership property would in the end be wholly insufficient to pay his liabilities.

The second subdivision of section 5110 requires the court to refuse a discharge, "if the bankrupt has concealed any part of his estate or effects." This specification is satisfied by proof that the bankrupt has concealed his title to real estate, by leaving out of his schedules property that has been conveyed by him in fraud of his creditors. In re Hussman, [Case No. 6,951;] In re Rathbone, [Id. 11,583, Id. 11,581;] In re Hill, [Id. 6,483;] In re Goodridge; [Id. 5,547.] The facts in this case seem to me to fall within the ruling of the supreme court in Humes v. Scruggs, 94 U. S. 22, and to establish a case of a conveyance made with intent to hinder, delay, and defraud creditors. The court in his case seems to me to establish a most salutary principle in holding that "if the money that a married woman might have had secured to her own use is allowed to go into the business of her husband, and to be mixed with his property, and is applied to the purchase of real estate for his advantage, or for the purpose of giving him credit in his business, and is thus used for a series of years, there being no specification when the same is purchased that such real estate shall be the property of the wife, the same becomes the property of the husband for the purpose of paying his debts; he cannot retain it until bankruptcy occurs and then convey it to his wife; such conveyance is in fraud of the just claims of the creditors of the husband." See, also, Phipps v. Sedgwick, 95 U. S. 3. Putting the facts in this case in the most favorable light for the bankrupt, it appears that he received this money of his wife without giving her security, or any written evidence of the loan; that he held it in his possession for upwards of twenty years, having in the meantime purchased land which he might have conveyed to his wife in satisfaction of the debt, but which he held in his own name, and thereby acquired credit at the bank; that the loan was made, partly at least, upon the faith of this security, and that he made the conveyance to his wife at a time when he was heavily indebted, and when a withdrawal of this amount of property from his assets was likely to embarrass him seriously in meeting his obligations. Although it does not appear that he had failed to meet his paper at that time, he continued embarrassed, and finally was compelled to wind up his business in a court of bankruptcy. This is regarded as sufficient evidence of insolvency as to existing creditors, whose debts remain unpaid. Bump, Fraud. Conv. 294. To hold that a member of a firm in embarrassed circumstances may convey all his individual property to his wife in payment of a debt barred by the statute of limitations for fourteen years is a premium upon fraud I am unwilling to offer. If such a transfer be sustainable at all, I think it should be made within a reasonable time, at least within the six years fixed by the statute. But it appears by the record in this case that Charles T. Allen, cashier of the Union City National Bank, the opposing creditor, in June, 1875, recovered a judgment in the circuit court for the county of Branch against the bankrupt for the debt which was proved by the bank in this court; that he afterwards filed a creditor's bill against Antisdel and his wife, praying that these conveyances be set aside and declared to have been made in fraud of creditors; that the case went to a regular hearing upon pleadings and proofs, and his bill was dismissed, and upon appeal to the supreme court, the decree of the circuit court in that regard was affirmed. It is insisted that the objecting creditor is estopped by this decree to claim here that this conveyance was made in fraud of creditors.

Three replies are made to this defence:

1. That the proceedings are not identical. A similar question arose in Re Hussman, [Case No. 6,951,] in which the opposing creditors pleaded a decree of a state court setting aside a similar conveyance as fraudulent in bar of a discharge, and the learned judge held it to be a case of res adjudicata. The question litigated in the state court was practically the same, and I see no reason why its judgment does not operate as an estoppel. See Downer v. Rowell, 25 Vt. 336. The cases of Jones v. Milbank, 6 Lans. 73, and Bradley v. Hunter, 50 Ala. 265, evidently have no application.

2. That the parties are not identical. But it appears distinctly by the testimony in this case, that Allen was cashier of the Union City National Bank, that the foundation of his suit was the debt proved by the bank in

this case, and that it was brought by Allen in his own name as trustee for the bank. Under these circumstances it is quite clear there is an estoppel as between the defendant and the person for whose use the suit is brought. Freem. Judgm. § 173; Hodson v. McConnel, 12 Ill. 170; Peterson v. Lothrop, 34 Pa. St. 223; Calhoun v. Dunning, 4 Dall. [4 U. S.] 120; Rogers v. Haines, 3 Greenl. 362; Boynton v. Willard, 10 Pick. 166.

3. That admitting the question is res adjudicata as between the opposing creditor and the bankrupt, it is insisted that the court is bound of its own motion to refuse a discharge, wherever it can see that the bankrupt has committed an act which if properly pleaded would bar a discharge. I know of but one case which tends to support this proposition, viz.: In Re Wilkinson, [Case No. 17,667,] in which the court, upon inspecting the record of the bankrupt's examination by the assignee, discovered that he had lost a large sum of money in gambling, and refused a discharge, although creditors interposed no objection. The circumstances of this case were such as to appeal strongly to the discretion of the court. The question does not seem to have been argued, and the matter apparently did not receive any very careful consideration. The other cases cited by counsel lend no support at all to this proposition. In Re Houghton, [Id. 6,730,] the only point considered was, whether the court could permit opposition to be made after the return day of the order to show cause, where a creditor, who ought to have considered himself the representative of all the creditors, had filed specifications of opposition, and then withdrew them. In the case of In re Palmer, [Id. 10,678,] the bankrupt obtained the consent of a sufficient number to entitle him to his discharge, but desiring to obtain also the consent of another creditor, "to strengthen his application," he gave him a note for $40 with security, and in consideration thereof the creditor signed his consent; another creditor opposed the discharge because of this transaction, and the learned chief justice held that, although there was a sufficient number and amount without this, he was still precluded from obtaining his discharge. It is true that he remarks in the course of his opinion that "the courts are as much bound by the provisions of the act as the bankrupt himself, and if it appears in the regular course of the proceedings that an applicant for a discharge has failed in any particular to perform his duties as a bankrupt, the application must be refused." This language, however, must be considered in connection with the facts of the case, which were far from sustaining the position that the court is bound of its own motion to refuse a discharge. The better opinion seems to be, that creditors who have been duly notified, and make no opposition, are regarded as consenting to a discharge; and that the court will only consider whether the bankrupt has committed an act which would bar a discharge, upon specifications regularly filed in opposition thereto. Creditors v. Williams, [Case No. 3,379;] In re Sullivan, [In re Sutherland, Case No. 13,640;] In re Schuyler, [Id. 12,494;] In re Rosenfeld, [Id. 12,-057.] The books are full of cases holding that the specifications must not be vague and general, but distinct, precise and specific, and so framed as to advise the bankrupt what facts he must be prepared to meet and resist. In re Rathbone, [Id. 11,580;] In re Hill, [Id. 6,482;] In re Hansen, [Id. 6,039;] In re Waggoner, [Id. 17,037.] But of what use all this particularity in framing an issue, if the court may disregard the issue thus framed, and refuse a discharge mero motu if it appears the bankrupt has committed any other act not covered by the specifications? Suppose there be a trial by jury upon the specifications; that upon such trial it should appear that the bankrupt had not committed the act alleged, or that a creditor was estopped to take advantage of it; but, that he had committed some other act which would bar his discharge; would the court be bound to refuse a discharge, notwithstanding the verdict of the jury that the specifications were not sustained. It seems to me that the statement of this proposition is its own answer. When the bankrupt has taken the required oath, I think a discharge should only be refused when some creditor has filed specifications of his opposition thereto upon which an issue can be joined, and the bankrupt be heard in his defence. I do not feel authorized in this case to refuse a discharge, but will direct it to be withheld for a few days to permit other creditors to intervene in case they should desire to do so. The point upon which these specifications are overruled is a technical one, and it may be that the court would permit other creditors who have awaited the result of this proceeding to intervene and take up these specifications in their own behalf.