## *In re* FREY and others, Bankrupts.

*(District Court, S. D. New York.   August 10, 1881.)*

1. BANKRUPTCY—BOOKS OF ACCOUNT.
   Where the objection to a bankrupt's discharge goes to the manner in which his books were kept, and to imperfections and omissions therein, the particular irregularities or omissions must be definitely specified to entitle them to consideration.

2. SAME—SAME.
   If, from such books as were kept by the bankrupt, his financial condition and an intelligible account of his business can be ascertained with substantial accuracy, the requirements of the bankrupt law have been complied with.

In Bankruptcy.   Final hearing upon specifications and proofs in opposition to bankrupts' discharge.

*M. H. Regensberger,* for bankrupts.

*T. H. Borowsky,* for opposing creditors.

BROWN, D. J.   The bankrupts composed the firm of Frey Brothers & Co., carrying on the business of manufacturing and selling cigars, tobacco, etc., in the city of New York.   They had a store in Vesey street, where they sold their goods, and a manufactory in another part of the city.   On April 28, 1876, they made a voluntary assignment of their property to Charles Loeb, a brother-in-law of J. L. Haas, one of the firm, in trust for the equal benefit of their creditors. About June 28, 1876, a petition, by certain of their creditors, was filed against the firm, upon which they were subsequently adjudged bankrupts, and an assignee was subsequently appointed, to whom, after a long-contested suit in equity, resulting in setting aside the prior voluntary assignment, Loeb transferred what then remained in his hands of the bankrupts' effects.   The specifications filed in opposition to the bankrupts' discharge state 14 grounds of objection, upon which a great mass of testimony has been taken.

The first objection, that the bankrupts failed to transmit a schedule of creditors, and a verified inventory, etc., in the form and manner required by section 5030, is obviated by their subsequent filing of those schedules, which is certified to by the register.

The second objection, that the assets do not equal 30 per cent.; that no assent of creditors has been obtained; and the fourteenth objection, that the debtors made a voluntary assignment as above stated,—are neither of them valid objections to a discharge in involuntary bankruptcy such as this.   Sections 5112*a*, 5021.

The third objection is that Jacob L. Haas, one of the bankrupts, swore falsely upon his examination, at the instance of the assignee,

on August 3, 1877, concerning the disposition of certain tobacco said to have been consigned to Beadles, Wood & Co., of New Orleans. This examination was three years prior to this proceeding for discharge. The examination was never read over or signed by the bankrupt. The counsel for the creditors, in the course of these proceedings, sought to compel the debtor to sign the old examination for the purpose of using it, as it stood, as evidence upon this proceeding. On examining the former testimony, which was originally taken by a stenographer, the debtor alleged that there were inaccuracies and errors in taking or transcribing it, and refused to sign it. Upon request of the counsel for the opposing creditors the matter was certified to the court, and, upon hearing before Judge Choate, this court, in January, 1881, declined to make any order requiring the debtor to sign the paper presented as his former testimony. This former deposition, not having been read to or signed by the debtor, was manifestly incomplete, and not of itself competent evidence upon this proceeding, in which the rules of evidence are the same as in ordinary trials. *In re Van Buren,* 2 FED. REP. 643, 649. No other evidence than this unsigned and incomplete deposition was offered to sustain the charge of previous false testimony; and, as this deposition was rightly rejected, the third objection is overruled as not sustained by any competent evidence.

The fourth, fifth, ninth, and tenth objections allege a fraudulent concealment, or fraudulent gift or transfer, of property, through shipments of tobacco, in February and March, 1876, to Beadles, Wood & Co., of New Orleans, and Zacharias & Co., of Chicago. The charge of an attempt at concealment or fraud in those shipments seems to have been based upon failure to find any accounts opened with those firms in the ledger or journal. The evidence shows, however, that these shipments were on consignment, and were entered not only on the United States revenue book, kept by the bankrupts, but in special consignment books kept with those firms. The remittances received from each firm, on account of the consigned goods, were duly entered on the cash-book, and the corresponding entries, under the head of "merchandise," were made in the journal and ledger, as parts of various aggregate entries from the cash-book, as pointed out by Mr. Haas in his testimony. These entries seem to be inconsistent with the theory of either concealment or fraud, nor do I find any sufficient evidence to sustain these charges.

The sixth and seventh objections allege concealment of books and papers, negligence in the custody of them, as well as false and

fraudulent entries therein, specially with reference to the alleged shipments of Beadles, Wood & Co., above referred to. But I fail to find any evidence sufficient to sustain either of these charges. Mr. Haas swears to the correctness of the entries; no one contradicts him; and the opposing creditors did not procure the testimony of either Harmon or any member of the firm of Beadles, Wood & Co., by whom they could most easily have proved the falsity of these entries, if fictitious. All the bankrupts' books and papers legally passed into the custody of their voluntary assignee; some were confessedly lost in subsequent legal proceedings without their fault; and I do not find any evidence of the firm's retention of any of them, or of negligence in keeping or turning them over.

The eighth objection charges fraudulent payments, gifts, and transfers, to the amount of $74,000, to Lagowitz & Co. These payments are alleged to have been made by checks, which were not put in evidence, and were proved only by the very imperfect evidence of the stubs of the check-book, which bore on each the word "exchange," or "exch." Mr. Haas testified that they were all given in exchange for checks or cash to the same amount received by Lagowitz & Co. A bundle of such checks of Lagowitz & Co. was produced on the hearing and offered for examination. I find many of them noted on the deposit side of the check-book, extending down to near the time of failure. This charge is not, therefore, sustained. Nor do I find any evidence of any fraudulent payment to Loeb & Co., as further charged in this same objection; nor that the claims proved by Lagowitz & Co. and by L. Haas are either false or fictitious, as charged by the eleventh objection.

The twelfth objection alleges that the bankrupts did not keep proper books of account, but kept them so carelessly and incorrectly, so far as the bulk of their transactions are concerned, that said books are utterly incapable of explaining the manner in which their business was conducted; that there is little connection between the cash-book, check-book, and bills-payable book; that much money was received of which there is to trace, and that the bulk of the payments for bills payable from January 1, 1876, to April, 1876, when they failed, are inexplicable; that no stock-book was kept; that checks were drawn not traceable in the cash-book or elsewhere; that it is impossible to balance the books, or ascertain from them a true statement or record as to what disposition the bankrupts made of their property between January and April, 1876.

The evidence shows that the books were kept by double entry;

that an invoice-book, which dispenses with the need of a stock-book, (*In re White*, 2 N. B. R. 590,) was properly kept, and that all the other usual or necessary books of account were also kept. The objection being, therefore, to the *manner* in which the books were kept, and to imperfections or omissions therein, general objections like those above stated are not sufficient. The particular irregularities or omissions must be pointed out in the specifications to entitle them to be considered. *In re Littlefield*, 3 N. B. R. 57; *Hammond* v. *Coolidge*, Id. 273.

The specifications under this objection accordingly state the following particular errors or omissions, which will be considered *seriatim*.

(*a*) No accounts in ledger or sales-book of the consignments to Beadles, Wood & Co. and to Zacharias & Co., or of the pledge of goods to De Fries upon a loan of $5,556.60. The consignments above referred to were entered in special consignment books, as already observed, and, so far as remittances were received on account of them, the proper debits were made in the cash-book, and the due counter entries were made in the journal and ledger under the merchandise account, corresponding with the receipts of cash entered in the cash-book. Nothing else was essential, so far as I can perceive, to the full understanding of these transactions. The entries, taken all together, showed the property consigned, its estimated value, the receipts from it up to the time of failure, and that sales by the consignees remained at the time of the assignment to be still accounted for. It would be time enough to enter in the sales-book when returns of sales were received. The testimony of the expert that there were no entries in relation to those consignments in the journal or ledger is shown to be incorrect. The fact that the entries were in aggregates, along with other items from the cash-book, does not exonerate him from the charge of having testified without sufficient examination, as the mode of entering by aggregates the transactions of several days from the cash-book was manifest upon the face of the books. As the transaction with Beadles, Wood & Co. was one of the main subjects of inquiry, and most strongly insisted on in several different objections, this error of the expert in so important a particular greatly weakens the force of all his testimony about the books.

As no particular mode or system of keeping books is required, (*In re Solomon*, 2 N. B. R. 287; *In re Newman*, 3 Ben. 20; *In re Townsend*, 2 FED. REP. 565,) it is optional with a merchant whether he will make his books few or many, general or special, and whether he will enter consignments in a general ledger or in special books for

that class of accounts. The same remarks apply to the loan of $5,556.60 from De Fries, and the pledge of warehouse certificates to secure it. Due entry was made of the money received in the cash-book, while the goods represented by warehouse certificates pledged were entered, as Mr. Haas believed, in a separate memorandum book. There was no entry in the other usual books, because, as he says, it was not necessary; on payment of the loan and the credit of cash so paid in the cash account the books would balance. The full statement of the merchandise pledged to De Fries and of the loan upon it, which was contained in the schedules filed not long after in connection with the voluntary assignment on June 6, 1876, which have been put in evidence, shows conclusively that no concealment was either made or intended, as is charged by the thirteenth objection.

The fact that such consignments and hypothecations of goods were exceptional transactions, not in the usual course of the business of the bankrupts, is perhaps a sufficient explanation of their not making the original entries of the merchandise consigned or pledged in their usual books, but in special books used for these purposes. As such special books afford all necessary information to understand the transactions, they cannot be held to be not "proper books of account" within the meaning of the bankrupt law.

(b) On the argument special objection was also made to the omission to enter in the cash-book or in any other book except the check-book, the numerous checks appearing from the stubs to have been given to Lagowitz & Co., above referred to, amounting in the aggregate to about $74,000. But as these were all "exchange" checks, as testified to by Mr. Haas, and so noted, mostly, on the stubs themselves, I see no reason to doubt the correctness of his testimony that "no further entry of them (even had payment of the checks been proved) was either necessary or proper." They did not affect the business any more than the cashier's giving bills from his drawer in exchange for a check to the same amount, for the accommodation of a friend, would have done. These exchanges were doubtless resorted to simply for the benefit of an apparent temporary increased balance in their bank account while the checks were going through the clearing-house, equivalent to one or two days' credit in bank. The entries in the check-book were, I think, all that were needed. If, in fact, any further entries of them would have been proper, their omission cannot be deemed material, as they did not affect the business or financial condition of the debtors. *In re Batchelder*, 3 N. B. R. 150.

(c) These considerations are a sufficient answer, also, to the general charge that the check-book and cash-book and bills-payable book do not correspond. Mr. Haas, one of the bankrupts, who kept the books and was himself an expert, testified that the one was not an index to the other. Nor does any reason appear why all receipts of cash or checks, or even those received from the payment of business debts, should be necessarily deposited in bank. They are often paid out directly on account of business obligations, and properly so. Checks may also be given out in exchange, or in making change, so as not to be necessarily entered in the cash-book. Perfect correspondence is not, therefore, to be looked for between the cash-book and the check-book on either side. Though a check-book may be made to serve the purposes of a cash-book, it is not usually so. Ordinarily, it presents but an incidental and subordinate account, viz.: an account of the particular drafts upon and deposits in the bank for which it is used. So, also, as between the cash-book and bills-payable book. A note or bill payable, paid otherwise than in cash or check, need not go in the cash account. An accommodation note, entered in the bills-payable book when issued, would have no corresponding entry at all upon the cash-book if never negotiated; nor, if negotiated, would the corresponding entry in the cash-book be made until the date of the receipt of money on it.

The expert mentions seven items between January and April, 1876, charged to bills-payable as paid in the cash-book, and not entered in the bills-payable book, amounting altogether to about $4,000. As the cash-book is the more important of the two, these omissions, if in fact omitted from the other book, would seem to be of little importance; but as the bills-payable book was lost by the creditor's counsel prior to these proceedings, and the extracts from it by the expert were confessedly partial and incomplete, Mr. Haas had no opportunity to contradict or explain the alleged omissions by reference to the book itself. These omissions were not pointed out in the specifications. Five of the seven were prior to March 1, 1876, when, as Mr. Haas testifies, the books actually balanced. The due counter entries as to these five must, therefore, have been somewhere made. The expert was not recalled to deny or qualify Mr. Haas' testimony that the books balanced to that date. There were no omissions, therefore, affecting the state of the business as to the five items prior to March 1st; and it cannot be assumed that the two subsequent alleged omissions were of any different character.

(d) "Accommodation paper to the amount of about $32,000 paid,

and entered only upon the cash-book and bills-payable book, and not otherwise traceable." The expert Muller testifies that this paper was accommodation, from the fact that it does not appear to have been given for merchandise, and no other entries appear than those above mentioned. That this was accommodation paper seems not to be denied; and, assuming this to be so, it does not appear, nor do I understand the expert to testify or intimate, that any further entries were necessary. The general charge that much money was received by the bankrupts which could not be traced, is contradicted by the expert.

(e) "The purchase between January 1, 1876, and May 1, 1876, of $55,000 worth of goods, and no account of the disposition thereof." All these purchases are made out from the invoice-book, which the expert says was properly kept. And in answer to the question whether he could explain from the books how they were disposed of, he answered "Yes." The voluntary assignment conveyed to the assignee whatever was not then disposed of. No deficiency is pointed out or intimated in the testimony. The entries in the consignment books supply, I presume, the supposed deficiencies referred to in this specification,

(f) "Large quantities of tobacco disposed of and not entered on the United States revenue book." There is no evidence that the book here referred to is one of the "books of account" referred to by the bankrupt act; nor do I find any evidence of omission of any goods which ought to have been entered in it.

(g) "That temporary loans and exchange checks are entered in the cash-book on either side as bills payable." If so entered, it would be immaterial. Such entries on temporary loans would be, evidently, proper enough; as to exchange checks, such entries would be needless, as above held, but do no harm. Previous objection was made that they were *not* entered in the cash-book. I do not find evidence, however, of the entries here complained of.

(h) "Numerous erasures in the cash and other books." But very few of these were specified in the testimony, and none of any comparative importance. Erasures are immaterial unless made in fraud, (*In re Antisdel*, 18 N. B. R. 289,) of which there is here no reasonable ground of suspicion, considering the comparative unimportance of the entries.

(i) "Impossible to balance the books, or to ascertain from them a true statement of the disposition of the bankrupts' property." The latter objection has been considered above. Mr. Haas testified that

the books could be balanced, and that they were balanced, in fact, on March 1, 1876, the month preceding the failure. Muller testified that they could not be balanced, but when asked why they could not be, said, "I cannot tell; there must be a mistake, or mistakes, in the books, which I did not take the trouble to find out;" nor does he intimate the amount of the discrepancy, whether material or immaterial.

In the cross-examination of Haas, the only defect or omission pointed out as needed to make the books balance, was the omission to enter in the cash-book $500 paid to L. Cohn & Co., for which their receipt was taken in the receipt-book, April 12, 1876. The stub of the check put in evidence shows, "April 10, L. Cohn, expense account, $500." This omission was obviously a casual one, and is not specified as a ground of objection in the specifications.

These objections have been considered with more particularity, perhaps, than was requisite. Not a single transaction was disclosed in the voluminous evidence which does not appear, in some form, upon the books of the firm. This circumstance, considering the industry and perseverance of counsel for the opposing creditors, affords a strong presumption that no concealment or fraud was intended.

The intricate and highly artificial system of book-keeping by double entry admits of many diverse modes of entering the same business transaction, and has given rise to standards of criticism among experts which the bankrupt act does not demand.

The standard in the mind of Mr. Muller, the expert in behalf of creditors in this case, who testified that these books were not properly kept, may be seen from his statement that a check-book is not properly kept if the checks are not numbered, or if more than one check is drawn against a single stub; that no erasure in a ledger is justifiable; and if an error be made in carrying out the figures it must be corrected in no other way than by a cross entry of "error" to an amount sufficient to make the needed correction; and that it is a very suspicious circumstance if entries are found in one book and not in another, although he admits, as an expert, that "the entry in one book even affords to his mind the conclusion that no concealment was intended."

It is manifest that the standard of this witness is not the standard of the bankrupt act. The object of the clause requiring "proper books of account" is primarily to secure the keeping of the necessary books to show the course and condition of a merchant's business; and the courts have held that it further requires that such books be

kept properly, having reference to the purposes of the act, viz., the ascertainment of all the debtor's proper assets and liabilities, and the distribution of his property among his *bona fide* creditors. This requirement is not incompatible with casual and unintentional mistakes. *In re White*, 2 N. B. R. 590; *In re Burgess*, 3 N. B. R. 196; *In re Jewett*, 3 FED. REP. 503.

It is sufficient if the entries are enough to determine, with substantial accuracy, the real condition of the debtor's affairs, and furnish an intelligible account of his business. *In re Solomon*, 2 N. B. R. 287, *per Grier*, J.; *In re Archenbrown*, 12 N. B. R. 17; *In re Antisdel*, 18 N. B. R. 289. It is not the office of book-keeping to furnish a complete historical record and a full explanation of all business transactions, but only brief memoranda or entries concerning them, and they often require a reference to other writings, documents, letters, or contracts, or to facts within the knowledge of the parties concerned, for their full explanation or comprehension. *In re Townsend*, 2 FED. REP. 559, 565; *In re Brockway*, 7 N. B. R. 598.

Additional writings are recognized by the bankrupt act, which requires their presentation and delivery to the assignee, (sections 5044, 5110, 5132;) and the bankrupt himself may be cited and examined under oath whenever required for the further elucidation of his accounts. Section 5086. These provisions would be needless if "proper books of account" alone would furnish full and complete knowledge of the debtor's affairs. To keep "proper books of account" does not, therefore, require the entry of all the details necessary to a full understanding of the matters referred to by the entries. Without such details brief memoranda, when sufficient to exhibit the debtor's "financial condition and course of business," are all that is required. The books, morover, are not required to be kept always posted or balanced, nor need the entries be kept up daily. *In re George*, 1 Low. 409. And if casual omissions are not a sufficient objection, still less can books be held to be improperly kept, when, as here, a few transactions complained of, though not entered in all the books, are all entered in at least some of them, and thereby the books themselves afford means for their own rectification.

Upon balancing the books for the short period of the debtors' business after March 1st, these partial omissions would have been observed and doubtless corrected. The expert seems not to have made any endeavor to supply the omissions which the books themselves afforded means of supplying. I do not understand him to testify that he could not ascertain from the books, with substantial accuracy,

the financial condition of the debtors, nor, with the aid of the consignment books, a proper account of the stock and previous course of business.

The discharge should, therefore, be granted.