TRUST COMPANY *v.* SEDGWICK.

The court adheres to its ruling in *Phipps* v. *Sedgwick* (95 U. S. 3), that, where a husband causes real estate to be conveyed to his wife in fraud of his creditors, a judgment *in personam* for its value cannot be taken, at the suit of his assignee in bankruptcy, against her, nor, in case of her death, against her executors.

APPEAL from the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

*Mr. E. S. Van Winkle* for the appellant.

*Mr. F. N. Bangs, contra.*

MR. JUSTICE SWAYNE delivered the opinion of the court.

Prior to the 1st of December, 1865, a copartnership existed in the city of New York, under the name of J. K. & E. B. Place. They were dealers in groceries. The members of the firm were James K. Place, Ephraim B. Place, and James D. Sparkman. The latter was a special partner. Under the law of New York, such partners can put a limited sum at risk, and are liable for nothing beyond it. At the date mentioned, this copartnership was dissolved. E. B. Place retired, and a new firm was formed, under the name of J. K. Place & Co. The members were James D. Sparkman and James K. Place. By the terms of the agreement, Sparkman was to contribute capital to the amount of $200,000, and Place to the amount of $600,000, and the profits were to be apportioned accordingly. After making due allowance for the payment of all liabilities, the estimated value of Sparkman's interest in the assets of the old firm was $262,000, of James K. Place's $227,000, and of E. B. Place's $168,000. The latter sum E. B. Place had a right to draw out at any time, and he subsequently received the most of it. The debts of the old firm at the time of the creation of the new one, exclusive of the sum due E. B. Place, amounted to $3,850,000. Adding what was to be paid to him, they exceeded $4,000,000. A part of the assets of the old firm was merchandise on hand, valued in gold at $996,000. To this was added, to show its value in currency, forty-eight per cent, making an aggregate of $1,474,000. There was also cash on hand, con-

sisting of balances in the banks with which the firm dealt, to the amount of $137,000. The other assets were chiefly bills receivable and accounts in favor of the firm. J. K. Place & Co. put no new capital into their concern. They bought the merchandise of the former firm at $1,474,000, the amount at which it was estimated in currency. This was nearly $1,000,000 in excess of the aggregate of the sum to which they severally claimed to be entitled out of the assets of that firm. They remained at its place of business, used its books, and applied its means in all respects as if that firm still subsisted.

By a deed bearing date on the 30th of November, 1865, James D. Sparkman assigned the leasehold premises here in question to James K. Place. By a like deed, dated on the 1st of December following, Place assigned the same premises to Mary A. Sparkman, the wife of James D. Sparkman. Both these deeds were acknowledged on the 5th and recorded on the 9th of the month last mentioned. The premises were the family residence of Sparkman. At the time of this transaction he settled upon his wife also the horses, carriages, and furniture which formed a part of the establishment. He likewise directed his counsel to prepare the proper instrument for settling upon his wife $40,000 of seven per cent bonds of the United States, which he had received as his proportion of a larger amount of those securities belonging to the old firm. He afterwards claimed that this settlement had been made. In one of his answers to the bill in this case he said: " That being about to embark as a general partner in the said firm of James K. Place & Co., and being well advanced in years, he was desirous of making, in favor of his wife, Mary A. Sparkman, since deceased, a settlement of a portion of his property; and on or about the first day of December, 1865, having paid in his proportion of the capital to be contributed by him to the firm of James K. Place & Co., he directed his counsel to take the proper steps to secure to his said wife, from his then existing remaining property, the sum of one hundred thousand dollars ($100,000), or thereabouts."

What was done touching the property mentioned was the intended realization of this plan. It is not questioned that the several items were worth the amount proposed to be settled.

Mary Ann Sparkman died on the 13th of October, 1866. By her will, which bore date on the 20th of July of that year, she gave the income of her estate to her husband, James D. Sparkman, for life, and after his death, the estate to his children. She had no children.

After her death, the leasehold premises were sold and conveyed by her executor to John Q. Preble. He paid $18,196.60 in cash, and gave his bond and mortgage for $40,000, being the balance of the purchase-money.

On the 27th of December, 1867, J. K. Place & Co. failed, and made an assignment to Burrit and Sheffield, for the benefit of their creditors. Subsequently, both the partners, Place and Sparkman, went into voluntary bankruptcy, and Sedgwick, the complainant, became their assignee under the bankrupt law. He filed this bill in the District Court to reach the $40,000 of government bonds and the proceeds of the leasehold premises, and to subject them to his administration. That court decreed in his favor with respect to the bonds, but dismissed the bill as to the real estate. He thereupon appealed to the Circuit Court. There the decree of the District Court was affirmed as to the bonds and reversed as to the realty. The court decreed, among other things, that the bond and mortgage of Preble should be delivered to the complainant; that the amount due upon them should be paid to him; and that the executor of Mary Ann Sparkman should pay to the complainant, out of the assets of her estate, the sum of $28,304.89.

This amount was made up of the cash payment received by James T. Sparkman, while executor, from Preble, with interest to the date of the decree, and interest paid to the executor by Preble on his bond and mortgage, with interest upon that also to the same period.

The executor thereupon removed the case to this court by appeal.

The appeal was limited to the leasehold premises and the money decree against the executor. None was taken with respect to the bonds of the United States. That subject is not therefore involved in the controversy as it is now before us.

Two questions are presented for our determination:—

1. Was the settlement of the leasehold property valid?

2. If not, was the money decree against the executor properly rendered?

On the first point we entertain no doubt. The debts of the old firm, as we have shown, were $3,852,000. The assets, as they appeared on the books, were $4,509,000. The debts were a sum certain, which grew constantly and largely by the accumulation of interest. How much less than their face the assets were worth does not appear. They were liable to constant depreciation from the failure and insolvency of those from whom they were due. A sudden fall of prices would have produced the same effect as to the merchandise. The cash on hand was less than three per cent of the amount of the liabilities to be paid. The assets of every kind, good and bad, exceeded the amount of the liabilities to be paid by only two-ninths. He would have been a bold, if not a rash man, who would have agreed to take all the assets and pay all the debts. No responsible person, we apprehend, would have entered into such a stipulation without a large premium in addition to the assets. The new company was embarrassed from the beginning, and failed within a few days over two years from the time it was formed. It was found to be hopelessly insolvent. Its liabilities exceeded its means by at least $600,000.

With these facts before us, we cannot hesitate to hold that Sparkman was in no condition to settle any thing on his wife when the new partnership was formed.

The turning-point in this class of cases is always whether there was fraud in fact. The result depends upon the solution of that question. When one engaged or about to engage in any business has the means to meet its usual exigencies, and devotes such means in good faith to the business, and has besides other means which he chooses to settle upon any object of his bounty, unlooked-for disasters on his part, subsequently occurring, will not affect the validity of the settlement, because they afford no ground for the imputation of unfairness. But where there are heavy subsisting liabilities, doubtful solvency, a large settlement made upon the wife at the outset of the business, and failure and insolvency to a large amount shortly follow, it is impossible to avoid the conviction that there was a deliberate plan to provide for the settler and his family in

any event, and to throw the burden of the losses that might occur upon his creditors. The intention animating such conduct is condemned alike by ethics and the law. We think the case before us falls within this category, and we are entirely satisfied with the judgment of the Circuit Court upon the subject.

But different considerations apply to the fund for which the money part in the decree was rendered. The moneys were received by the executor for property sold by him after the death of the testatrix. It was lent by him to the firm of Place, King, & Place, and was lost to the estate by their failure. There is no proof that the testatrix took any part in bringing about the settlement, or that there was any guilty knowledge on her part in the transaction. It is fairly to be presumed that she confided in the good faith of her husband, and simply yielded obedience to his wishes. The provision of her will attests her devotion to him. The fund did not exist in her lifetime, and her estate has been in no wise benefited by it. The transfer of the property was his act, not hers. She was only a passive recipient. Her will — doubtless influenced, if not controlled by him — gave him her entire estate for life, and, after his death, gave it to his family. No provision was made for her family.

The sphere of the avocations and duties of husband and wife are different. Usually she knows little of business and property interests. It is natural that she should confide in his integrity, and be guided in every thing by his kindly judgment. She is always *sub potestate viri.* Hence, the disabilities and safeguards which the law wisely throws around her.

Chancellor Kent says: "The husband is liable for the torts and frauds of the wife committed during coverture. If committed in his company or by his order, he alone is liable." 2 Com. 149. "And if a wife act in company with her husband in the commission of a felony, other than treason or homicide, it is conclusively presumed that she acted under his coercion, and is consequently without any guilty intent." 1 Greenl. Evid., sect. 28. See also *Liverpool Adelphi Loan Association* v. *Fairhirst,* 9 Exch. Rep. 422, and *Gordon* v. *Haywood,* 2 N. H. 402.

A *feme covert* may be a trustee, but her husband is personally liable for any breach of trust she may commit, and hence she cannot act in the administration of the trust without his concurrence or consent. Hill, Trustees, 464; *Phillips* v. *Richardson*, 4 J. J. Marsh. (Ky.) 212. She is not liable upon the covenants of title in a deed executed by herself and her husband. Schouler, Dom. Rel. 155. Upon the subject of her disabilities, see *Norton* v. *Meader*, 4 Sawyer, 603.

This part of the decree was clearly erroneous, and the error must be corrected.

The cases of *Phipps* v. *Sedgwick* and of *Place* v. *Sedgwick* (95 U. S. 3) were branches of this litigation. They presented the same questions of fact and law which we have considered in this case. Those questions were disposed of as we have now determined them. The fulness with which the views of the court, speaking through Mr. Justice Miller, were expressed, renders it unnecessary to add any thing to what has been already said, on the present occasion.

This case will be remanded to the Circuit Court, with directions to modify the decree in conformity to this opinion; and it is

*So ordered.*