FRANK B. SHELDON, TRUSTEE, APPELLEE, v. MAUDE LORD PARKER ET AL., APPELLANTS.*

FILED DECEMBER 3, 1902. No. 12,380.

Commissioner's opinon, Department No. 3.

1. **Bankruptcy**: TRUSTEE'S RIGHT OF ACTION: CONVEYANCE: LIMITATION OF RIGHT OF ACTION. Where a person has been declared a bankrupt under the act of congress approved July 1, 1898, the trustee appointed in that proceeding may maintain an action to set aside a conveyance made by the bankrupt at any time within two years after the estate has been closed, provided the action was not barred by the laws of this state at the time the petition in bankruptcy was filed.

2. **Bankrupt Act**: TITLE IN TRUSTEE:. RIGHT OF ACTION. The bankrupt act vests the assignee with title to all property conveyed by the bankrupt in fraud of creditors, and he may proceed to recover the interest of the bankrupt in the property, whether any creditor was in position to attack the transfer or not.

3. **Fraudulent Conveyance to Wife**: JUDGMENT IN PERSONAM. Where property has been conveyed to the wife in fraud of the husband's creditors, it can be pursued and subjected to the payment of his debts; but the pursuit of the property can not be abandoned, and a judgment *in personam* for its value taken against the wife.

4. **Evidence**. Evidence examined, and *held* to support a finding by the district court that certain conveyances were fraudulent as to creditors.

5. **Trustee in Bankruptcy**: RIGHTS. A trustee in bankruptcy must, in certain cases, resort to the courts of the state to recover

---

* Rehearing allowed. See opinion, p. 634, *post*.

property of the bankrupt fraudulently conveyed.  In such cases he is entitled to all remedies and all relief that would be afforded any other party litigant under the same facts.

APPEAL from the district court for Gage county.  Action by trustee in bankruptcy.  Heard below before LETTON, J. Decree for plaintiff.  Defendants appeal.  *Affirmed in part.*

*Thomas J. Doyle, George W. Berge, Hugh J. Dobbs, Francis M. Davis* and *John N. Rickards,* for appellants.

*Nathan K. Griggs, George M. Johnston, Leonard W. Colby, Albert H. Babcock, Samuel Rinaker* and *Robert S. Bibb, contra.*

DUFFIE, C.

On the 19th of July, 1899, Lewis C. Parker, one of the appellants herein, was, on his own petition, duly adjudicated a bankrupt by the district court of the United States for the district of Nebraska.  Frank B. Sheldon is the trustee of the bankrupt estate, and because of the insufficiency of the assets to pay the claims of the creditors, amounting to about $26,000, he instituted this action to have certain property held by Maude Lord Parker, wife of the bankrupt, and by the Drake Land Company, a corporation, decreed to be held by said parties in trust for the said Lewis C. Parker, and the conveyances thereof set aside, and said property held to belong to the trustee. Numerous pieces of property are described in the petition filed in the district court, of which it is alleged Lewis C. Parker is the equitable owner; but upon the trial the court found that three tracts only were held in trust for the bankrupt, and that two other tracts, the legal title to which had stood in the name of his wife, had been conveyed by her to innocent purchasers, and entered judgment against her for their value; and as the trustee has not appealed from the decree, it will only be necessary to examine the decree entered and the evidence upon which it is

based, so far as it relates to the property decreed by the court to belong to the bankrupt.

The first tract is what is known as the "Home Place." This embraces about sixteen acres of land, which, for some years prior to 1896, was the homestead of Almira T. Parker, the mother of Lewis C. Parker. Maude Lord Parker, wife of Lewis C. and one of the appellants, claims title to this tract through a deed of conveyance made to her by Almira T. Parker, dated May 6, 1899. The district court found that on February 20, 1896, Almira T. Parker, then a widow, made a division of her property between her two sons, Lewis C. Parker and Frank H. Parker; that to perfect said division, she executed deeds to several pieces of property, which deeds were delivered to Lewis C. Parker, to be held in trust for himself and his brother, Frank, until the death of their mother, who was to retain a life interest therein. Among other tracts conveyed was the home place, Lewis C. and Frank H. Parker being joint grantees in the deed conveying that property. The court further found that this deed was never recorded, but that by virtue of said deed Lewis C. Parker acquired an undivided one-half interest in the premises conveyed, the said Frank H. Parker acquiring the other undivided one-half interest; that on the 3d day of May, 1899, Frank H. Parker, being then the owner in fee of an undivided one-half of said home place, for a valuable consideration, paid to him by Lewis C. Parker, sold and conveyed by warranty deed the undivided one-half interest which he then had and owned in said premises, whereby said Lewis C. Parker became sole and entire owner of all of said premises; and that for the purpose of fraudulently concealing his ownership of said premises from his creditors, and hindering, delaying and defrauding such creditors, Lewis C. Parker caused the deed to himself from Frank H. Parker for said premises, to be so altered and manipulated as that the legal title to said premises now appears to be in the name of the defendant Maude Lord Parker, his wife; that on or about the 6th day of May, 1899, the defendants Lewis C. Parker

and Maude Lord Parker procured from Almira T. Parker a deed of that date, purporting to convey said premises to said Maude Lord Parker; that Almira T. Parker at said time was occupying and residing upon said premises under an agreement between said Lewis C. Parker and Frank H. Parker entered into at the time she made the first deed to Lewis C. and Frank H. Parker; and that at the time she executed the deed to Maude Lord Parker she had no right, title or interest in or to said home place other than the right to reside thereon and enjoy the income therefrom during her natural life; and that Maude Lord Parker acquired nothing by the deed dated May 6, 1899, from said Almira T. Parker, save the right to use and occupy the premises thereby conveyed until the death of said Almira T. Parker, which occurred in February, 1901.

We think the evidence fully sustains this finding of the court. On the 23d of March, 1896, a written agreement was made between Frank H. and Lewis C. Parker, which recites the following: "This agreement, made and entered into this 23d day of March, A. D. 1896, by and between Frank H. Parker of Santa Cruz, California, and Lewis C. Parker of Beatrice, Nebraska, witnesseth: That whereas the estate of Almira T. Parker has been divided between the parties hereto, that said division is hereby mutually agreed upon; and it being the desire of the parties hereto to make no change of title to property owned by Almira T. Parker until after her death, and whereas certain papers pertaining to her estate have been properly executed and are now in the hands of Lewis C. Parker to be held by him for Frank H. Parker and himself: Therefore be it understood and agreed by the parties hereto that the following papers are not to be recorded until the death of Almira T. Parker: . * * * Deed from Almira T. Parker to Frank H. Parker and Lewis C. Parker jointly conveying lots 42 to 60, and 63 to 71, inclusive, of I. N. McConnel's subdivision of the south half of the southeast quarter of section 32—4—6, being the home place, of about sixteen acres; lot 26 McClelland's addition; also the northwest quarter of

27—1—33, Rawlins county, Kansas: Deed from Almira T.
Parker to Lewis C. Parker of the east 24½ feet of lot 11,
block 48, Beatrice, Nebraska." * * * Other properties
and personal property were described in this agrement,
which it will not be necessary to mention in connection
with this case; but the agreement is important as an
acknowledgment by Lewis C. Parker of the possession of
this deed, and the joint ownership by himself and his
brother of the property conveyed thereby.

There is other and stronger evidence in the record to
support the finding of the district court. In order to fully
understand the situation it will be necessary to go back to
the death of Hiram W. Parker, the father of Frank and
Lewis, which occurred April 11, 1893. At the time of his
death Hiram W. Parker was largely interested in the
Beatrice Canning Company and had become liable upon
the notes of that company for something over $34,000.
On the 20th of March, 1896, Frank H. and Lewis C. Parker
entered into a written agreement, in which it is recited
that they are the only heirs at law of Hiram W. Parker,
and that it was desired to settle up said estate without
administration; that they had agreed upon a division of
said estate throughout, except the homestead, consisting
of about sixteen acres, in West Beatrice, where the widow
of the deceased now resides. The agreement then continues
as follows: "And whereas the said Hiram W. Parker was
party as maker to several promissory notes and other
evidences of indebtedness in the sum of $5,000 for the
Beatrice Cemetery Association, and in the sum of $34,150
for the Beatrice Canning Company of Beatrice: Now,
therefore, be it understood and agreed, that said Lewis C.
Parker has already assumed the liabilities of the said
Hiram W. Parker for the payment of said indebtedness
and may be compelled to pay large sums thereof: There-
fore, it is further agreed, that any indebtedness of the late
Hiram W. Parker aforesaid that he, the said Lewis C.
Parker, may be compelled to pay, either in the way of
principal, or interest, or costs, or attorney fees, by reason

of his having assumed said liabilities, shall be borne equally by the parties hereto. And it is further agreed that the proportionate share of said indebtedness, which the said Frank H. Parker shall pay, as per the terms of this agreement, shall be and remain a charge upon any property in the state of Nebraska owned by the said Frank H. Parker." * * * On the back of this agreement appears the following: "Beatrice, Nebr., May 23, 1899. In consideration of the delivery of a certain warranty deed to the property known as the home place of Almira T. Parker in West Beatrice, wherein Frank H. Parker and wife convey to Lewis C. Parker all their right, title and interest in and to said property, the said Lewis C. Parker accepts said property as full payment from the said Frank H. Parker of the obligation contained in the within agreement, and the same is hereby canceled and surrendered."

The evidence, to our understanding, is quite conclusive that after Almira T. Parker, the mother of Frank H. and Lewis C. Parker, deeded what is known as the "home place" to her sons in 1896, the deed conveying that property was delivered to Lewis C. Parker and held by him for himself and his brother. Afterwards he entered into negotiations with his brother for the purchase of Frank's one-half interest in the property, and some time previous to April 28, 1899, Frank H., who lived in California, had made out and sent to Lewis C. a deed for his half interest in that property. Under date of April 28, 1899, Lewis C. wrote to Frank as follows: "Yours received and noted. Under the circumstances and to avoid any litigation, I am willing to purchase your one-half in the home place for the indebtedness due me from you, acct. Canning Co. affairs. The deed you sent was not correct description. I enclose one written exactly as the title shows on record. Upon its receipt by me I will surrender to you receipts in full for any and all amounts due me from you on statements rendered and thus close up this unpleasant matter. Ma is to have a life lease on the place, of course. She is to pay the taxes and conduct it balance of her life as she

has in the past. I am fully in the right in my statements and accounts and demands made upon you; and further, if you think there is any speculation in owning Ma's place I will bind myself to sell it to you at any date you name within three years at not over $6,000. I think I am treating you perfectly fair by knocking off the $1,200 or $1,500 in the actual value of the place, but as I said, to close the affair I am willing to do so. It may be best to have two witnesses to your deed. Our law requires it here. I am in deep water in these judgments yet, and could not safely own this or any other property. You will notice that my name is written (first part) in lead pencil so I can change it if occasion demands. I am notified that suit will be brought in May term of court on the $11,140 Canning Co. notes now held by 1st Nat'l Bank. These will go to judgment. Also Babcock holds $5,600 more notes, making balance of $34,500 Canning Co. notes. Babcock's expires in June, so he will sue in May. I mention this to show you that I am not out of the woods by any means." That the deed mentioned in this letter was executed by Frank H. Parker and wife is abundantly shown by a later letter written to Frank H. by Lewis C. of date May 23, 1899, in which he says: "Dear Brother Frank: I am in receipt of deed conveying your interest in the home place on West Side subject to mother's life lease, in payment by you to me of any and all of the sums due me on account of Beatrice Canning Co. and Cemetery Association obligations made by W. H. Parker and assumed by me. I return herewith canceled agreement as requested, and trust you may find the same correct and satisfactory." The canceled agreement returned to Frank in this letter is the agreement of March 20, 1896, above referred to, and on the back of which is the receipt of Lewis C. Parker, accepting said deed in full payment of the obligation contained in the agreement.

We think that the evidence of Lewis C. Parker's own letters fully justifies the finding that he purchased his brother Frank's one-half interest in the home place in

consideration of a release to Frank of any liability upon
the notes upon which their father was liable at the time
of his death; that Frank executed a deed for the property
some time previous to April 28, 1899, which was not re-
corded, but another deed made out by Lewis C., in which
his given name was written in pencil, and sent to his
brother, Frank, to execute; that this latter deed was re-
turned, and the given name of Lewis C. written in pencil,
erased, and that of his wife inserted in lieu thereof; that
this deed and the deed of May 6, 1899, afterward executed
by Almira T. Parker to Maude Lord Parker, were placed
of record, and constitute the claim of title asserted by
Maude Lord Parker to the home place. The only fair
inference to be drawn from the facts in evidence is that
Almira T. Parker conveyed her interest in this home
place to her two sons in 1896; that thereafter Lewis C.
Parker purchased his brother's half interest in the prop-
erty for the consideration above detailed; that he procured
a deed in which his first name was written in pencil; that
this was afterwards erased and his wife's name substi-
tuted; that he thereafter procured a deed from his mother
running to his wife, and that these two deeds were placed
of record for the purpose of showing title in his wife. In
the letter of April 28, 1899, above quoted from, he sug-
gests getting a deed from his mother, and says: "Your ex-
ecuting this deed is signifying your willingness, but you
better write her a letter setting forth the fact that you
have sold your entire interest in the real estate owned by
her and you authorize her to deed to me or my order the
home place." Taking the evidence furnished by the let-
ters of Lewis C. Parker himself, we think that the finding
of the district court is fully supported by the evidence
and that its conclusion was the only one that could be
rationally drawn from the circumstances.

A second tract in dispute is part of a lot in the city of
Beatrice, generally known as the "Moody building." Re-
lating to this the court found:

"The court further finds that on about the 20th day of

February, 1896, the said Almira T. Parker, a widow, being then the owner of the following described real estate situated in the city of Beatrice, in the county of Gage, state of Nebraska, to wit: The west half of lot eleven (11) (except six inches off the west side thereof) in block forty-eight (48) in the original town, now city, of Beatrice, being the real estate generally known and described as the 'Moody Building,' or 'Moody Property,' for a good and sufficient consideration, by warranty deed duly executed, conveyed said premises to the said Lewis C. Parker, who then and thereby became the absolute owner of said premises in fee simple, and has ever since said last mentioned date continued to be and still is the absolute owner in fee simple of said premises, subject only to the rights and title of the plaintiff in and to said premises since the 19th day of July, 1899, by virtue of plaintiff's appointment as trustee of said Lewis C. Parker and his estate in bankruptcy, as aforesaid; that said deed to said west half of said lot eleven (11) in block forty-eight (48) in the city of Beatrice was on or about the 20th day of February, 1896, after being duly signed and acknowledged by said Almira T. Parker, by the said Almira T. Parker duly delivered to the said Lewis C. Parker; that at the time the said deed was so delivered to the said Lewis C. Parker, the said Lewis C. Parker was the sole grantee in said deed and the name of the said Lewis C. Parker appeared in said deed as the sole grantee therein; that some time after the delivery of the said deed to the said Lewis C. Parker and after the title to and the ownership of said premises had been vested in him, but before said deed had been recorded, the said Lewis C. Parker, for the purpose of fraudulently concealing his ownership of said premises from his said creditors and of hindering, delaying, cheating and defrauding his said creditors, fraudulently changed the said deed by so altering the same as to cause the name of the defendant Maude Lord Parker, the wife of said Lewis C. Parker, to appear as grantee in said deed in place and instead of the

name of the said Lewis C. Parker; that said deed was not recorded until the 11th day of February, 1897, at which time said deed, after having been fraudulently altered as aforesaid, and in its said fraudulently altered form was by the said Lewis C. Parker filed for record in the office of the register of deeds of Gage county, Nebraska, and was then in its fraudulently altered form recorded in said office; that the said recording of the said fraudulently altered deed by the said Lewis C. Parker was made for the purpose of fraudulently concealing the ownership of said premises by said Lewis C. Parker from his creditors and causing said Maude Lord Parker, the wife of said Lewis C. Parker, to appear to be the owner of said premises and thereby hindering, delaying and defrauding the said creditors of said Lewis C. Parker."

The court further found that on the 30th of September, 1899, this property was conveyed to the Drake Land Company, and that said conveyance was made for the purpose of further hindering, delaying and defrauding the creditors of Lewis C. Parker; that the conveyance to the Drake Land Company was wholly without consideration; that Maude Lord Parker, at the time of such conveyance, was the principal stockholder in said company and a director thereof; that the president of the company was her step-father; that the secretary was her husband, and that her mother was also a director in the company; that these parties owned all the stock of the company and managed its affairs; and that whatever title or interest the said Maude Lord Parker and the said Drake Land Company, or either of them, may have or may have had in or to said premises, was in equity and good conscience held merely in trust for Lewis C. Parker. It is undisputed that Almira T. Parker was the owner of this property prior to the 20th of February, 1896. On that day it is conceded that she deeded this property. The plaintiff claims that the deed ran to Lewis C. Parker, while the defendants assert that the conveyance was to Maude Lord Parker. In the agreement of March 23, 1896, heretofore referred

to, the deed conveying this property was described as a deed from Almira T. Parker to Lewis C. Parker for the east 24½ feet of lot 11, block 48, Beatrice, Nebraska. A true description of the lot is the west 24½ feet of lot 11, block 48, or, as described in the recorded copy of the deed, "the west half of lot 11, in block 48, in the city, formerly town, of Beatrice, according to the recorded plat thereof, except a strip six inches wide off the west side of said lot."

Does the evidence support the finding of the court? Frank H. Parker, who was present when this deed was made, testifies that he saw his mother sign it, and that it was a regular printed form of warranty deed, the blanks being filled with the writing of Lewis C. Parker. Relating to the making and delivery of these deeds he says: "They were left there after my mother signed them. She got up from her desk and left the deeds on the desk. I looked at them and examined them and then we talked what we would do with those deeds. I says, 'You take them and put them in your safe or in your vault, or in the bank,' and I suppose they were; and before I went away, a month later, in March, I requested a memoranda of these papers that they should be left with him in trust, and we entered into that agreement because I wasn't going to be there on the ground and he was. The deeds, the inventory—I took the inventory and left the deeds in his hands according to that agreement. Q. After these deeds were signed by your mother there on that day did you ever see them again? A. Yes, sir. They were all together on his desk when we talked about the agreement. Q. After that day where did you see them? A. They were in his hands and left in his desk." It can not be doubted that to whomsoever the deed ran, it was made and delivered on the 20th of February, 1896, and that on the 20th of March of the same year, at the time the agreement of that date was entered into between Frank and Lewis, this deed, with others, was in the possession of Lewis C. Parker; the strong inference from the evidence being that it was taken by Lewis C. from the residence of Almira T. Parker when made, and remained in his pos-

session from that time as late at least as the 20th of March, 1896. That it was the deed referred to in the agreement of March 20th, there can be no question; and that the title of Mrs. Almira T. Parker passed by the deed and its delivery is a legal proposition which no one will doubt. On the other hand, Mrs. Maude Lord Parker claims and testifies that on the date of the making of the deed it was delivered to her, and that her name was inserted therein as grantee. The production of the deed would undoubtedly have shown whether the name of the grantee or a description of the property conveyed had been changed, or whether any erasures had been made. The deed was last seen in the possession of Lewis C. Parker. No good reason is shown by any of the defendants for its non-production on the trial. The notary who took the acknowledgment, and who presumably knew the description of the property conveyed and the grantee named in the deed, was present at the trial, but was not called by the defendants. The plaintiff did not call him for the reason that he was one of defendants' attorneys, assisting in the trial of the case. Frank Parker testified that after the recording of the deed in February, 1897, he visited Beatrice and examined the records. He says: "I had some intimation that there had been some papers changed or something done different from that—that statement there, that agreement—and I came back here and my brother wasn't here and I went to the records and found the deed for that property on record contrary to that agreement, that is, that it should not be put of record until after mother's death. The deed of record of that property was in the name of Maude Lord Parker, his wife." He further states that he asked his brother why he recorded that deed contrary to the agreement, and why he changed the name, and his brother replied: "I had to; I could not have anything go in my own name." It is true that in some conversations and affidavits made prior to the trial Frank H. Parker made statements somewhat contradictory of his evidence given on the hearing. It is also true that his

evidence relating to this deed is squarely contradicted by the evidence of Lewis C. Parker and Maude Lord Parker, but it was for the district court to determine the weight of the evidence and the credibilty of the witnesses, and the rule has now been too long established to be departed from that a finding of the district court based on sufficient evidence will not be disturbed. We do not mean to say that where there is but an iota of evidence to support a finding, that this court will not interfere; but where there is evidence distinct and positive going to support a finding of the trial court, we can not interfere with that finding, although there is other evidence just as distinct and just as positive contradictory of the finding.

That Lewis C. Parker was devising ways and means to put his property beyond the reach of his creditors, is abundantly and overwhelmingly shown by his letters to his brother, and as these letters will have to be taken into consideration in passing on some of the other transactions involved, we will quote from them here. In a letter of November 6, 1896, relating to the conveyance of a lot by Frank H. Parker, he said: "Make deed in blank, or to my wife, Maude Lord Parker. As the shape my finances are in just now—owing to 1st Nat'l and Cann'g Co. complications, I do not wish to own it myself. See?"

In a letter of December 28, 1896, he wrote his brother as follows: "I think I wrote you why I can not have property in my own name. You will remember I signed my name to paper," etc. "1st Nat'l holds $11,401. * * * You can readily see that if I own any real estate they can take it on judgment. Now I took the land (½ section near Pickrell, joining Frank Holt farm on the east) in Lysander Cowles' name. They can not touch that, at any rate not just now. There will probably be a lot of litigation ahead for me. * * * My home place is in Maude's name. So the deed you are to send me should be likewise. * * * I am 'not a property owner' on the records."

Under date of September 8, 1899, he wrote his brother

as follows: "The 1st Nat'l have sued the Cemetery notes. Babcock has sued his $6,500 or $7,000 notes and 'tis about $42,000 now going in judgment against me. How to get out I don't know. You will appreciate my unpleasant position. I have taken your part in standing off Lysander and Mrs. Gregory. I took your part in saving from the wreck your Voortman building and Court St. properties. If the H. W. P. debts had been prosecuted immediately after his death it would have consumed all of his property. Lawyer Johnston seems to have some information as to your and my statements. Be careful and not write to any lawyers about your and my affairs. * * * If you are alive to your own brother's interests in helping make somebody else pay the Canning Co. debts you can help me. Will you do it? I am and have written you in complete confidence and expect my letters to reach no one but you."

Under date of October 22, 1899, he wrote as follows: "As I wrote you I have filed my petition in bankruptcy to shut out the 1st Nat'l and Cemetery notes. Don't know how it will come out yet. I wrote you to hold all letters and statements I sent you as strictly confidential and of course you will. * * * By wiping out all of these old scores I can get on my feet and do some business somewhere when the time comes, but with $40,000 judgments over one's head can do nothing. Whether I get my discharge or not does not affect any settlements you and I have had or any matters between us. * * * Well, Frank, all I wish to ask is that you be cautious and don't furnish Johnston, Griggs, Rinaker & Bibb, or any lawyers any information that they might try to get from you. They would like to keep a judgment against me alive for years, thus catching any real estate they could. Of this matter I could explain more fully if I could see you. If your deposition is called for don't give it. Wire me here if you need a quick answer on anything of this kind."

On August 27, 1900, he wrote: "My bankruptcy case is to be heard September 7. The attorneys in the case have

filed a creditors' bill against any and all property that I ever owned and it will be a long hard fight, I guess. Of course I expect you to assist me in any way you can by not giving them any clues to our correspondence on business matters. Whatever business transactions you and I have had is none of their business. They are trying to get a hold on the home place of Ma's by the allegation that you have deeded that to me. * * * I ask you as a brother to maintain secrecy on any and all our correspondence relative to this place as to whether we ever talked or had a settlement as it will surely go for the Canning Co. debts if they can prove that I ever had any interest in it. If you have any inquiries from any of them be very careful how you write, but I prefer that you do not write them anything. * * * It may have been a mistake to start the bankruptcy proceedings here but I saw no other course at the time to get clear of the wreck."

It is not to be wondered at that a court, with these letters before it, should require from the party writing them, and from his close relatives, the clearest possible proof that any property once standing in the name of Lewis C. Parker, and afterwards appearing in the name of these relatives, was purchased and paid for in good faith, throwing upon them the burden of proving the entire *bona fides* of the transaction.

The third piece of property involved is the east 120 feet of lot 3, block 12, Cropsey's addition to the city of Beatrice. This lot, together with two others, constituted the homestead of Frank H. Parker prior to his removal to California. He testifies that some time after leaving Beatrice he sold two of the lots to his mother, who conveyed them to Maude Lord Parker; that he reserved lot 3, and that afterward, on account of the transactions between himself and his brother, and to settle an account between them, he sold the lot to his brother, but that the deed was made to Maude Lord Parker at his brother's request. Relating to the making of this deed Lewis C. Parker wrote under date of December 28, 1896: "My home

place is in Maude's name so the deed you are to send should be likewise. I wish to move my barn over to the alley and need the lot more on that account than any other." It is not pretended by the defendants that Maude Lord Parker paid anything for this lot, but they claim that the purchase of Frank's homestead by Almira T. Parker included this lot as well as the other two. This, however, is squarely contradicted by the evidence of Frank, who says that he reserved this lot. The finding of the district court is sufficiently sustained by the evidence, and we can not interfere therewith.

The fourth tract involved is what is known as the "Camden farm," consisting of 240 acres. Relating to this the court found that Lewis C. Parker was the owner of this land November 12, 1885; that on June 1, 1895, he conveyed the same, without consideration, to his cousin, Lysander Cowles; that Cowles, on the 13th of June, 1895, without consideration, conveyed the same to Maude Lord Parker; that these conveyances were merely colorable and were made for the purpose of placing the title in Maude Lord Parker and to defraud the creditors of Lewis C. Parker; that on the 28th of March, 1899, Maude Lord Parker and her husband conveyed said premises to one Susan E. Hooper, a bona-fide purchaser, for over $5,000. It is further shown that a mortgage for $2,500 existed on the land, which was paid and satisfied by Maude Lord Parker prior to her conveyance to Susan E. Hooper. The court further found that the interest of Lewis C. Parker in said land, at the date of its conveyance to Mrs. Hooper, was $1,500; and that Maude Lord Parker is liable to account to plaintiff for said sum, with interest at seven per cent. per annum from March 28, 1899.

The fifth tract is 1.15 acres in the southeast corner of the southeast quarter of section 34—4—6, and the north half of lot 35, except the north 50 feet thereof, of McConnell's subdivision of the south half of the southeast quarter of section 32. The court found that on August 28, 1896, Lewis C. Parker was the owner of this property, and that on that

46

day he made a pretended conveyance thereof to Homer B. Austin, who was then in his employ; and that on December 1, 1896, Austin, without any consideration, made a pretended conveyance of said premises to Maude Lord Parker; that these conveyances were colorable, without consideration, and a fraudulent device to hinder, delay and defraud the creditors of Lewis C. Parker; that said premises, before the bringing of this action, were sold and conveyed to an innocent purchaser, and the proceeds, amounting to $244, received by Maude Lord Parker, and that she is liable to account therefor, with interest at seven per cent. from August 23, 1898. The evidence in support of the finding of the court is much the same as that relating to the other transactions, and is, we think, sufficient to support a finding that the transactions were fraudulent. The question, however, of whether a personal judgment should be entered against Maude Lord Parker for the amount received for these several properties, is a question of some difficulty.

In *Phipps v. Sedgwick*, 95 U. S., 3, 9, a personal judgment having been rendered against a married woman in favor of an assignee in bankruptcy on account of property given by her husband, Justice Miller, in reversing that part of the decree, said: "While the books of reports are full of cases in which real or personal property conveyed to the wife in fraud of the husband's creditors has been pursued and subjected to the payment of his debts after it had been identified in her hands, or in the hands of voluntary grantees or purchasers with notice, we are not aware of any well-considered case of high authority where the pursuit of the property has been abandoned, and a judgment *in personam* for its value taken against the wife. * * * The statutes of the different states have gone very far in this country to modify the peculiar relations of husband and wife, as they existed at common law, in reference to their property. But they have not, except perhaps in Louisiana, gone so far as to recognize the civil-law rule of perfect independence in dealing with

each other.   While the statutes of New York have recognized certain rights of the wife to deal with and contract in reference to her separate property, they fall far short of establishing the principle that out of that separate property she can be made liable for money or property received at her husband's hands, which in equity ought to have gone to pay his debts.   Equity has been ready, where such property remains in her hands, to restore it to its proper use, but not to hold her separate estate liable for what she has received, and probably spent at his dictation. Such a proposition would be a very unjust one to the wife still under the dominion, control and personal influence of the husband.   In receiving favors at his hands, which she, supposed to be the offerings of affection, or a proper provision for her comfort, she would be subjecting that which was her own, or which might afterwards come to her from other sources, to unknown and unsuspected charges, of the amount and nature of which she would be wholly ignorant.   It answers the demands of justice in such cases if the creditor, finding the property itself in her hands or in the hands of one holding it with notice, appropriates it to pay his debt.   But, if it is beyond his reach, the wife should no more be made liable for it than if the husband himself had spent it in support of his family, or even of his own extravagance."   This rule was reaffirmed in *United States Trust Co. v. Sedgwick*, 97 U. S., 304, where the common-law rule exempting the wife from personal liability for acts committed in connection with, or in the presence of, her husband, is relied on to exempt her in such cases.   We have been referred to no case, nor have we discovered any, which establishes a different doctrine.   It is true that in *Phipps v. Sedgwick*, 95 U. S., 3, the property conveyed to the wife was an apparent gift from the husband at a time when he was not being pressed by his creditors, and the case does not show that the wife was an active participant in any fraudulent design which the husband may have entertained.   Whether a different rule should be applied in a case where the wife has knowledge of her husband's

fraudulent purpose, and becomes an active participant therein, aiding and assisting him in covering up his property, is a question which may be open to discussion; but even in that case it is a matter of gravest doubt if the presumed influence and dominion of the husband over his wife, and her actions relating to his property and interest, should not relieve her from any personal liability, inasmuch as our enabling statute does not attempt to enlarge her powers, except in so far as it relates to her separate business or estate. As at present advised, we are inclined to believe that the rule established by Judge Miller is the proper one to enforce, and we hold, therefore, that the creditor can not take a personal judgment against the wife for the value of property conveyed to her in fraud of creditors; that the only remedy of the creditor is to pursue the property itself, making it answerable for his demands if it be found in the hands of the wife or of any grantee to whom she may have conveyed it without consideration, or with knowledge of the fraud.

A technical objection is made to the decree from the fact that the plaintiff's petition, as originally filed, alleged that the conveyance of the home place by Almira T. Parker to Lewis C. and Frank H. Parker was made in the early part of the year 1899, but it is apparent from the whole record that the defendants were not misled by this statement in the petition, and that the trial proceeded upon the theory that such conveyance was made in 1896. At the close of the trial the district court, in exercise of a discretion with which we can not interfere, allowed the plaintiff to insert the year "1896" in place of the year "1899," so that the petition as it now stands charges the conveyance to have been made in 1896.

The defendants have pleaded the statute of limitations as a defense to the action. Subdivision e of section 70* of the bankrupt act provides as follows: "The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from

---

* U. S. Compiled Statutes, 1901, p. 3452.

the person to whom it was transferred, unless he was a bona-fide holder for value prior to the date of the adjudication. Such property may be recovered or its value collected from whoever may have received it, except a bona-fide holder for value." Subdivision *d* of section 11* of the act is as follows: "Suits shall not be brought by or against a trustee of a bankrupt estate subsequent to two years after the estate has been closed." The petition in this case was filed on August 27, 1900, and the creditors of the bankrupt may be presumed to have had notice of the fraudulent character of the deeds made to Maude Lord Parker and to the Drake Land Company at the date of their record. By the laws of this state, an action for fraud is barred in four years, and had Lewis C. Parker not taken advantage of the bankrupt act, his creditors would have been compelled to bring an action within four years from the discovery of the fraudulent character of the conveyances attacked in this action, or from the time when they discovered the fraud. As these conveyances were recorded less than four years prior to the commencement of this action, and as there is no evidence in the record before us to show that any discovery of the fraudulent character of such conveyances was made prior to the filing of the deeds for record, the presumption must obtain that that is the earliest date at which the creditors had notice of any fraud connected with the transaction. So that these actions would not be barred, even under the laws of the state.

Another view of the case leads to the conclusion that the actions were not barred as against the trustee, even as early as the bar of the statute would interpose an obstacle to a suit by the creditors. The filing of the petition in bankruptcy by Lewis C. Parker vested in the federal court complete jurisdiction over his estate. After that date no creditor could bring an action either to recover his debt or to subject property fraudulently conveyed to its payment. Such actions, by operation of the bankrupt law, are vested in the trustee of the bankrupt estate. As

---

* U. S. Compiled Statutes, 1901, p. 3426.

we have seen, by the provisions of section 11 of the bankrupt act, the trustee has two years from the closing of the estate to bring an action.

In *Freelander v. Holloman,* Fed. Cas. No. 5,081, also reported in 9 N. B. Reg., 331, 334, the question of the application of the statute of limitations was considered by the court. It is there said: "The constitution of the United States conferred upon congress the power to establish a uniform system of bankruptcy throughout the United States; and when congress, in pursuance of this power, passed the bankrupt act, it at once superseded all laws in conflict with it. The bankrupt's estate, and every thing and right connected with it upon the bankruptcy at once passed under the control and operation of the bankrupt law. After that the rights of those in interest may be contracted or enlarged as congress in its wisdom may provide. This provision in the second section provides that all rights of action barred upon the appointment of the assignee shall remain barred, whether in favor of or against the assignee, and gives both to the assignee and those claiming an adverse interest to any property claimed by the assignee in the adverse possession of others, or claimed by others, to property in the hands or under the control of the assignee, two years in which to commence proceedings in equity or at law for its recovery. This is a separate and independent provision, and has no connection with any state statute on the subject; it may extend or may contract the time provided in the state statutes of limitations. Thus, if at the time of the appointment of the assignee but a few days remained of the time necessary to complete the bar, the time would be extended; or if the statute had just commenced running, and under the state law would have ten years to run, as in case of actions of ejectment to recover real estate, it would be complete within two years." See also *Rock v. Dennett,* 155 Mass., 500, 30 N. E. Rep., 171.

To the objection that the creditors whom the trustee represents have not exhausted their legal remedy, and that

the suit can not be maintained on this account, it is sufficient to say that the law under which the trustee was appointed authorized him to bring and maintain actions of this character. *Platt v. Matthews,* 10 Fed. Rep., 280; *Mueller v. Bruss,* 88 N. W. Rep. [Wis.], 229; *Hood v. Blair State Bank,* 3 Nebr. [Unof.], 432, 447.

A careful review of the record and proceedings in this case leads us to conclude that the decree of the district court is right, with the exception only of the entry of a personal judgment against Maude Lord Parker. We recommend, therefore, that the decree be affirmed, except in so far as it awards a personal judgment in favor of the plaintiff against Maude Lord Parker for the sum of $——, and as to that part of the decree we recommend that it be reversed.

After the entry of the decree, the defendants took an appeal to this court and filed a supersedeas bond in the penal sum of $4,200. This bond was approved and filed on June 8, 1901, and was conditioned for the payment of the personal judgment entered against Maude Lord Parker and against waste of the other property involved in the appeal, in case the decree appealed from should be affirmed by this court. On October 21, 1901, the plaintiff applied to the district court for the appointment of a receiver and on November 30, 1901, a receiver was duly appointed by the court, with directions to take charge of the home place, the Moody building, and the east 120 feet of lot 3, block 12, Cropsey's addition; to rent the same and to hold the rents subject to the further order of the court. From this order the defendants have appealed.

The defendants object to the appointment of a receiver by the state court upon the ground that the plaintiff is the trustee of the bankrupt estate, and is himself practically a receiver of all property found to belong to that estate. It is also said that unsurmountable difficulties at once become manifest when we stop to analyze the effect of the appointment of a receiver by a state court in a bankruptcy proceeding. The receiver, perforce of the ap-

pointment, at once becomes an officer of the court appoint-
ing him and amenable to the orders of that court, and of
that court alone.   The property of which he becomes cus-
todian is property which can only be administered through
the federal court.   The question of his fees becomes a mat-
ter of allowance by the state court.   The fees of the trustee
in bankruptcy are fixed by federal statute.   All distribu-
tions must be made by the trustees under order of the
federal court.   No act of the receiver can render him
guilty of a contempt of the federal court.   In *Bardes
v. Hawarden Bank,* 178 U. S., 524, it was held that
the provisions of the second clause of section 23 of the
bankrupt act of 1898* controlled and limited the juris-
diction of all courts,including the several district courts of
the United States, over suits brought by trustees in bank-
ruptcy to recover or collect debts due from third parties,
or to set aside transfers of property to third parties,
alleged to be fraudulent as against creditors, including
payments in money or property to preferred creditors.   In
other words, it is held that the trustee must commence an
action in the state court in all cases where the parties de-
fendant are residents of the state in which his appoint-
ment was made.   Under the law his official character as a
trustee gives him no greater right to commence an action
in the federal court against residents of this state than
he possessed as an individual, and the federal congress,
having relegated such cases to the jurisdiction of the state
courts, has conferred upon the state court full authority
to act, and to tax the usual costs and expenses attending
such suits, the same as in other cases; and this being so,
the trustee is entitled to the same consideration, the same
remedies and the same relief that other suitors are en-
titled to claim at the hands of the court.   The trustee in
a proper case may have a receiver for property pending
the trial or pending an appeal, if the circumstances attend-
ing the case would entitle any other litigant to the same
relief.

It is clearly established by the evidence taken upon the

* U. S. Compiled Statutes, 1901, p. 3431.

hearing that the Drake Land Company is a Kansas corporation, having no assets in this state except its claim to the Moody building, which was set aside by the decree of the district court in this case. The rental value of this property is shown to be from $45 to $50 per month. The appeal bond does not cover these rents. It would be extremely unfair to the plaintiff to require him to seek the courts of a foreign jurisdiction to collect rents from the Drake Land Company, which were collected and paid to it for the use of this property during the pendency of this appeal. We are entirely satisfied with the action of the court in appointing a receiver for the property known as the Moody building. We think, however, that the situation so far as it relates to Maude Lord Parker is entirely different. While temporarily absent from the state, she is still a resident of Beatrice. In an affidavit filed she claims to be the owner of property of the value of $30,000, and that property of the value of $6,000, aside from the property known as the home place, is situated in Gage county. There seems to be no reason to apprehend that any rents collected by her pending this appeal will be lost, or that the plaintiff would have to sue in the courts of another state to collect the same. The taxes which were due upon the property at the time the application for a receiver was made were paid before the hearing.

We recommend that the order appointing a receiver be affirmed so far as it applies to property known as the Moody building, and reversed so far as it applies to the property known as the home place and the east 120 feet of lot 3 in block 12 in Cropsey's addition.

AMES and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, it is ordered that so much of the decree of the district court as awards the plaintiff and appellee a personal judgment against the defendant and appellant Maude Lord Parker, be reversed and that the decree be in all other matters affirmed. It is further ordered that the

order of the district court appointing a receiver for the property known and described in said order as the "home place" and for a part of lot 3, block 12, Cropsey's addition to the city of Beatrice, be reversed and that said order be in all other respects affirmed.

AFFIRMED IN PART.

June 18, 1903, the following opinion was filed on rehearing. *Affirmed,* but remanded to ascertain costs of receivership:

Commissioner's opinion, Department No. 3.

1. Husband and Wife: CREDITORS: FRAUD: TRANSFER OF PROPERTY: INNOCENT PURCHASER: PERSONAL JUDGMENT AGAINST WIFE. Where a husband and wife confederate to defraud creditors by transferring property of the husband to the wife, and such property is sold to an innocent third party, so that it can not be reached by the creditors of the husband, a personal judgment may be entered against the wife for the proceeds of such sale, provided it appears, or is fairly to be presumed, that she still retains such proceeds or her separate estate has had the benefit thereof.

2. Receiver: APPOINTMENT: ERRONEOUS ORDER. Where an order appointing a receiver is erroneously made, but is not reviewed until the main case in which the receiver was appointed has been heard on appeal in this court, and on such appeal it is determined that the party applying for the receiver is entitled to the rents and profits of which the receiver took possession, the order will not be reversed or set aside, as such action could not benefit either party to the action and would probably result in further litigation and costs.

DUFFIE, C.

On the former hearing, it was held that the district court erred in entering personal judgment against Maude Lord Parker for the proceeds of the Camden farm received by her, on the sale to an innocent third party, and also in the appointment of a receiver for the property conveyed to her by her husband, the title to which she still retains. It was said in the former opinion, reported *ante,* page 610, that, "as at present advised, we are inclined to believe that the rule established by Judge Miller [in *Phipps v. Sedgwick,* 95 U. S., 3], is the proper

one to enforce; and we hold, therefore, that the creditor can not take a personal judgment against the wife for the value of property conveyed to her in fraud of creditors, and that the only remedy of the creditor is to pursue the property itself, making it answerable for his demands if it be found in the hands of the wife or of any grantee to whom she may have conveyed it without consideration, or with knowledge of the fraud." A reexamination of *Phipps v. Sedgwick, supra,* and *United States Trust Co. v. Sedgwick,* 97 U. S., 304, 24 L. Ed., 954, leads us to believe that these cases are not a precedent for the one at bar. In these cases it is quite apparent from the facts shown that the wife had no knowledge of any contemplated fraud by her husband in the conveyance made to her. She was not an active participant in any fraudulent design. In the case at bar the court held—and the evidence is ample to sustain the finding—that Maude Lord Parker was an active participant in the fraudulent designs of her husband and took title to the property for the purpose of assisting him in a scheme to defraud his creditors. Under such circumstances, we think that any addition to the separate estate of the wife coming from a sale of the property received from her husband with the intent and design to defraud his creditors, should be held liable to the extent that the creditor may prove that the wife's estate has been benefited by such transactions. It would be opening too wide the door for fraud to hold that no personal judgment might be taken against the wife for property received from her husband with the fraudulent purpose of placing it beyond the reach of his creditors, where it is shown that the proceeds of such property, although sold to an innocent party, are still retained by her, or where, from the circumstances of the case, such may fairly be presumed to be the case. If such was the law, the success of a scheme to defraud creditors would depend solely on the ability of the wife to convert the property into cash before the creditors learned of the trans-. action, or had time to commence an action to reach the

property. Cases may arise where the wife, being under the influence and dominion of the husband, may accept a conveyance from him, fraudulent on his part, and where the property may have been sold, and the proceeds expended in the support of the family, or for her own personal use. Under such circumstances, it would be exceedingly unjust to make the separate estate of the wife liable for the value of such property. As said by Judge Miller, in such cases: "In receiving favors at his hands which she supposed to be the offerings of affection, or a proper provision for her comfort, she would be subjecting that which was her own, or which might afterwards come to her from other sources, to unknown and unsuspected charges, of the amount and nature of which she would be wholly ignorant." If, therefore, she can show that the property received from her husband has been expended, and that her own separate estate has not received the benefit thereof, we are still of the opinion that no personal judgment should be entered against her for property received from her husband. In the present case the testimony of Mrs. Parker herself shows that she had placed in the hands of J. S. Drake between nine and ten thousand dollars for investment, and that in making up this sum the proceeds of property conveyed to her by her husband are included. Not only has she failed to show that this money has been expended, but her evidence affirmatively discloses that she still has it on hand, and in the possession of her stepfather, to be invested for her benefit. Under these circumstances, justice and equity require that she should refund it to the trustee for the benefit of the creditors of her husband.

Relating to the appointment of a receiver for the property still standing in her name, had that question been presented and determined before the submission of the case upon its merits, we are still convinced that the order making such appointment should be reversed. By agreement of parties, the hearing upon the appointment of a receiver was submitted at the same time with the prin-

cipal case, and in the meantime the receiver had taken possession of the property, and collected the rents and profits therefrom. The principal case, having been affirmed upon the merits, is proof conclusive that the trustee is entitled to the rents and profits of the property during the pendency of the appeal. In other words, should the order appointing a receiver be reversed at this time, and the rents and profits received by him refunded to Maude Lord Parker, the trustee would be compelled to institute an action to recover them from her. On her showing made against the appointment of a receiver, she claims to have property in and about Beatrice to the value of $6,000 or more, and the trustee would be derelict in his duty if he did not attempt to subject this property to the value of the rents and profits which he is entitled to receive from the real estate in the hands of the receiver. Under these circumstances, it is apparent that to reverse the order appointing the receiver, and turn the money in his hands over to Mrs. Parker, would only result in further litigation and costs, and could be of no benefit to the appellant, further than to save her the costs of the proceedings, which can be provided for by the order of this court. While disapproving, therefore, of the order appointing a receiver for her property, we believe that in the present condition of the case the best interests of all the parties require that the order should be affirmed, but at the cost of the appellee.

We recommend, therefore, that the judgment of the district court in the main case be affirmed in all things, as well, also, as the order appointing a receiver for the property.

KIRKPATRICK and POUND, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, it is ordered that the decree of the district court be affirmed, and that the order appointing a receiver for the property held in the name of Maude Lord Parker be also affirmed, but that the case be remanded to the district

court solely for the purpose of ascertaining the costs of the receivership proceeding so far as it relates to property of Maude Lord Parker, and that such costs, together with the costs of this court in that proceeding, be taxed to the appellee.