## PHIPPS v. SEDGWICK.

### PLACE v. SEDGWICK.

1. The court, upon consideration of the facts in this case, holds that certain real estate settled upon a woman by her husband was purchased with the assets of the firm whereof he was a member, and that the assignee in bankruptcy of the firm is, after the payment of the mortgage thereon, entitled to the proceeds thereof.

2. Where property is conveyed to a wife in fraud of her husband's creditors, a judgment *in personam* for its value cannot be taken against her, nor, in case of her death, against her executors.

APPEALS from the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

The first case was argued by *Mr. William M. Evarts* for the appellants, and by *Mr. F. N. Bangs* for the appellees. The second case was argued by *Mr. F. K. Haywood* for the appellants, and by *Mr. F. N. Bangs, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

These are appeals presented by two different parties, against whom decrees were obtained in the Circuit Court by the

appellee, Sedgwick, who sued as assignee in bankruptcy of James K. Place and James D. Sparkman, doing business in the city of New York as partners, under the style of James K. Place & Co.

The controversy in the District Court, where it was commenced, and in the Circuit Court, where it was heard on appeal, turned mainly on questions of fact, to be determined by the weight of evidence; and the most important part of it does. so here. The evidence is voluminous and complicated, the record amounting to over eight hundred pages of printed matter. It cannot be expected that in delivering our judgment we should sustain it by any minute analysis of this testimony. We can profitably do no more than state the propositions in controversy, and the results of our inquiry upon them.

Place and Sparkman, succeeding to the business of J. K. & E. B. Place, as wholesale grocers, commenced business as partners on the first day of December, 1865, and so continued until Dec. 23, 1867. Their operations amounted to several millions of dollars. On the day last mentioned, finding themselves insolvent, they made a general assignment to Lewis W. Burrit and Thomas T. Sheffield; and, on the twenty-seventh day of February, 1868, they filed a petition in bankruptcy, under which the appellee, Sedgwick, was appointed assignee.

Some time after this, the assignee brought his bill in chancery in the District Court for the Southern District of New York, where the bankruptcy proceedings were pending, against the two bankrupts, and sundry other persons supposed to have money or property which ought to come to the assignee, or to have liens or other claims on such property. A decree was rendered which settled finally much that was in controversy, but in reference to two important matters appeals were taken to the Circuit Court; and it is in regard to the same matters that the two appeals now before us are taken.

The first of these, involved in the first case, grows out of the allegation in the bill that certain real estate, which we shall call the Fifth Avenue property (and which was sold under order of the court pending the suit and the proceeds paid into court), was, in law and equity, the property of the bankrupts, and that the proceeds should go to the assignee, to be admin-

istered as part of the assets of the bankrupt firm. John L. Phipps & Co. asserted a claim to this property and these proceeds, which we will presently consider. The District Court decided that the Fifth Avenue property was but a fair and reasonable settlement of James K. Place upon his wife, which was not fraudulent as to his creditors, and ordered the proceeds of the sale to be paid to Phipps & Co., who asserted rights under Mrs. Place. On appeal, the Circuit Court reversed this decree, and held that the settlement was fraudulent as to creditors, and ordered the proceeds of the sale, amounting to $93,161.42 to be paid to the assignee. From this branch of the decree Phipps & Co. appeal to this court.

The other branch of the case relates to what we shall call the Forty-third Street lots.

A similar allegation is made in the bill as regards these lots, which, having been conveyed to Mrs. Place, and by her to other parties, and several exchanges and purchases and sales made by her, the assignee claims to have identified the property until the last sale, for which it is alleged that she received $16,000; and for this sum the assignee recovered a decree against the executors of Mrs. Place, who died pending the suit. This decree of the District Court was affirmed in the Circuit Court, and from it the executors appeal to this court, which constitutes the second case.

1. As regards the Fifth Avenue property, it may be as well to state the relation to it of Phipps & Co., the appellants. It appears that they were largely creditors of J. K. Place & Co. at the time of their failure; and, in endeavoring to secure payment of their debt after the assignment of that firm, a mortgage was given by Mrs. Place on the Fifth Avenue property to secure the sum of $50,000. Mr. Place joined in this mortgage. On the very day of the application of Place & Co. to be declared bankrupts, a personal judgment was obtained against them on the debt of Phipps & Co. It seems to be clear that the mortgage was taken under such circumstances of notice of the nature of Mrs. Place's title on the part of Phipps & Co., that their claim under that mortgage is no better than the title of Mrs. Place. The whole matter, therefore, turns upon the question of the validity of the conveyance to

her, as a fair and honest provision made by a husband engaged. in business, by appropriating a part of the means embarked in that business to that purpose. For it is not denied that the entire sum which went to purchasing the ground lease, building the house, and furnishing it, amounting to more than $100,000, was paid out of the moneys of the firm of J. K. Place & Co.

The evidence affecting the validity of this settlement is voluminous, consisting of an examination of the books of account of the insolvent firm, the testimony of Mr. Place and many other witnesses, accompanied with deeds, assignments, and other papers in writing. We cannot go over all this, and, concurring as we do with the opinion of the Circuit Court, it is unnecessary. A few observations must suffice.

The basis on which the honesty and fairness of the settlement is supported in argument is, that on the first day of December, 1865, — the day on which the old partnership of J. K. Place & E. B. Place was superseded by the firm of J. K. Place & Co., composed of J. K. Place and Sparkman, — Mr. Place was worth $227,000. This estimate resulted from the balance-sheet of the old firm ; and that sum constituted the capital which he put into the new firm. It was in the month of September previous to this that he bought the ground lease of the lots in questions, taking the assignment to himself ; and between that time and the 1st of December he entered into contracts for the erection of a building on the lots, which were supposed to amount to $50,000 or $60,000, but which in the end came to about $90,000.

There is some question whether the assignment of the lease of these lots to his wife was made on the first day of December, when it bears date, or on the first day of the next April, when it was acknowledged or recorded, with a preponderance of evidence, as we think, in favor of the latter. But upon the supposition that Mr. Place was, on the first day of December, fairly entitled to consider his interest in the business as worth $227,000, was it good faith to his creditors to withdraw about one-third of that capital and invest it in his wife's name, so that it was placed beyond the reach of his creditors, and made to constitute a luxurious home for himself? If the business

which the partnership was doing was a small and a safe business, and the shape in which this sum of $227,000 stood was such as made it unquestionable as representing so much money, while the withdrawal of $90,000, if otherwise fair, might be sustained, it would still be of doubtful validity as against creditors.

But there are other and controlling circumstances in this case which we will refer to: —

1. The business of the partnership was not a small one. On the contrary, it was very large, and must have amounted to several millions per annum. The very balance-sheet on which the transaction is defended showed that the debts of the firm at that date were near $4,000,000, and the credit side consisted in goods on hand and in debts due the firm. Of course, the real value of this balance was conjectural and uncertain.

2. The proportion of this balance was not more than ten per cent of the debts of the firm, a very small capital for such a large business; and it was unfair to the creditors to withdraw one-third of that.

3. There is strong reason to believe that other liabilities of Mr. Place in other ventures, and in regard to his purchase of his brother's interest in the old firm, when fairly taken into the account and charged against this balance, would have reduced it very considerably. How much, cannot be precisely ascertained.

4. But, though Mr. Place had given his obligations to pay what amounted to $90,000 on the house building, that was his personal obligation, and at its date was not a debt of the firm. If he afterwards took the money of the firm to pay those individual debts, at a time when the business of the firm could not stand it, the transaction must be treated as of the date when the money was so withdrawn, and its honesty tested by the condition of the business at that time. The books of the firm show that there was paid on this account up to Dec. 31, 1866, or within one year and one month after the new firm began, $82,000, including that paid before, and in the first three months of the next year, $13,000. These same books show that during this time the condition of the partnership had changed largely for the worse, independently of these outlays.

The losses on the rapid decline of gold, which affected the value of their goods, and the amounts lost on the gold which they carried, was estimated at $150,000 for the first year. Losses in two collateral concerns, in which one or both of the partners were interested, also became apparent; so that before the end of the first year any prudent man must have seen that, in withdrawing so much cash from his business, he was choosing between the danger of the bankruptcy of his firm on one side, and a luxurious home for himself and wife on the other.

5. Mr. Place had agreed with his partner, Sparkman, to put into the business $600,000 of capital, to $200,000 by Sparkman. This was a moneyed obligation which he was bound to perform, but which he never did perform; and, instead of enlarging the nominal capital of $227,000, we have shown that he took over $100,000 from it for this house.

6. The books of the firm were kept in a manner which, on inspection, would show that the Fifth Avenue property was an investment which belonged to the firm, and should be counted as part of its assets; and this remained the condition of the books until after the assignment, when the book-keeper charged the whole up to Mr. Place, and thus by a stroke of the pen after insolvency, and after the assignment, $100,000, which had appeared as property of the firm, became nothing but the debt of an insolvent partner of that firm.

For these reasons, we think the decree of the Circuit Court, that the assignee was entitled to the proceeds of this property after paying a mortgage admitted to be a just claim, is right.

In reference to the decree for the payment of money against the executors of Mrs. Place on account of the Forty-third Street lots, we are of a different opinion.

The lots in which the money of the firm was first invested, and which was the beginning of this separate real-estate transaction, are estimated by the master at the value of $4,000. By subsequent exchanges or sales, the fund is traced to another piece of real estate, which is supposed to be worth $16,000; for which sum with interest a judgment is rendered against Mrs. Place.

But we are of opinion that Mrs. Place, if living, could not

be subjected to such a decree, if all that is said be true ; nor can her executors be now.

While the books of reports are full of cases in which real or personal property conveyed to the wife in fraud of the husband's creditors has been pursued and subjected to the payment of his debts after it had been identified in her hands, or in the hands of voluntary grantees or purchasers with notice, we are not aware of any well-considered case of high authority where the pursuit of the property has been abandoned, and a judgment *in personam* for its value taken against the wife.

Certainly no such doctrine is sanctioned by the common law; and, though the present suit is a bill in chancery, the decree in this case is nothing more than a judgment at law, and could as well have been maintained in a separate suit at law for the money as in this suit. And the liability of the executors of the wife to this personal judgment must depend on the same principle as if, abandoning the pursuit of the *res*, the assignee had brought an action at law for the money.

The statutes of the different States have gone very far in this country to modify the peculiar relations of husband and wife, as they existed at common law, in reference to their property. But they have not, except perhaps in Louisiana, gone so far as to recognize the civil-law rule of perfect independence in dealing with each other. While the statutes of New York have recognized certain rights of the wife to deal with and contract in reference to her separate property, they fall far short of establishing the principle that out of that separate property she can be made liable for money or property received at her husband's hands, which in equity ought to have gone to pay his debts. Equity has been ready, where such property remains in her hands, to restore it to its proper use; but not to hold her separate estate liable for what she has received, and probably spent at his dictation. Such a proposition would be a very unjust one to the wife still under the dominion, control, and personal influence of the husband. In receiving favors at his hands, which she supposed to be the offerings of affection, or a proper provision for her comfort, she would be subjecting that which was her own, or which might afterwards come to her from other sources, to unknown and unsuspected charges,

of the amount and nature of which she would be wholly igno-
rant. It answers the demands of justice in such cases if the
creditor, finding the property itself in her hands or in the hands
of one holding it with notice, appropriates it to pay his debt.
But, if it is beyond his reach, the wife should no more be made
liable for it than if the husband himself had spent it in support
of his family, or even of his own extravagance.

For these reasons, we are of opinion that so much of the
decree of the Circuit Court as directs the payment of the pro-
ceeds of the Fifth Avenue property to Sedgwick, the assignee,
must be affirmed, but without prejudice to the right of the
holder of Phipps & Co.'s debt to present it for allowance as a
claim against the bankrupts' assets, in regard to which we
decide nothing. The decree against the executors of Mrs.
Place will be reversed. In all other respects, the decree of the
Circuit Court will be affirmed, and the cause remanded for
further proceedings in conformity to this opinion; and it is

*So ordered.*