(127 So. 206)

## WIEGAND v. ALABAMA POWER CO.

### 7 Div. 928.

Supreme Court of Alabama.

March 27, 1930.

Knox, Acker, Sterne & Liles, of Anniston, and Martin, Thompson, Turner & McWhorter, of Birmingham, for appellee.

Bibb, Field, Field & Woolf, of Anniston, for appellant.

GARDNER, J.

Complainant Wiegand, an electrical contractor of Anniston, Ala., completed the wiring of some houses for two of his customers, to which the defendant Alabama Power Company refused to connect its electric current because of complainant's refusal to install a certain type of switch considered by defendant more advantageous and safe than the old. Thereupon Wiegand filed the bill in this case seeking a mandatory injunction against the power company requiring such connection. From a decree dissolving the temporary injunction theretofore issued, and dismissing the bill, complainant prosecutes this appeal.

The bill charges that defendant's demand is illegal, arbitrary, and unreasonable and violative of complainant's right and those of the public, operates to set up a monopoly, and is in restraint of trade; deprives complainant of the right to contract according to law as well as free competition in the contracting business. The bill further shows the

duty defendant owes to complainant and the public, and avers that, unless relief is granted, complainant's business will be destroyed. The equity of a bill of this character is well established, and is not here controverted. Tallassee Oil & Fertilizer Co. v. Holloway, 200 Ala. 492, 76 So. 434, L. R. A. 1918A, 280; Hardie-Tynes Mfg. Co. v. Cruise, 189 Ala. 66, 66 So. 657; Sparks v. McCreary, 156 Ala. 382, 47 So. 332, 22 L. R. A. (N. S.) 1224; Mobile & O. R. R. Co. v. Zimmern, 206 Ala. 37, 89 So. 475, 16 A. L. R. 1352; Walker v. City of Birmingham, 216 Ala. 206, 112 So. 823; City of Montgomery v. Greene, 180 Ala. 322, 60 So. 900.

It was established without dispute that the type of switch sold and installed by complainant for his customers met the requirements of the Southeastern Underwriters' Association, with which the city of Anniston was satisfied, and that the city inspector issued his certificate therefor.

Defendant insists these were minimum requirements only, and not intended to preclude a public utility from adopting more improved and progressive instrumentalities, and that in fact the adoption and use of such improvements were contemplated in rule 2 of a general order 14 of the Alabama Public Service Commission reading as follows:

"(a) The entire plant of each utility shall be constructed and installed in accordance with accepted good practice.

"(b) Each utility shall, so far as practicable, operate and maintain its entire plant and system in such condition as will enable it to furnish safe, adequate and continuous service within its hours of operation."

Defendant further insists that its requirement of the new type of switch is not only in keeping with the foregoing order, but also in compliance with its general duty to its employees and to the public; that the new type of switch is recommended by the National Electric Safety Code issued by the United States Bureau of Standards of the Department of Commerce, which code is the best and most widely known and accepted code having to do with the manner of using electric energy with safety to life and property, while the Underwriters' Association is primarily interested in the protection of property only. Defendant adopted a rule requiring this new type of switch for all contractors, and gave due notice thereof to complainant, and discussed with complainant the advantage of the new type over the old. Complainant knew defendant's rule before making this contract. The new type of switch is readily obtainable in the open market, and put out by a number of manufacturers.

Defendant does not deal in these switches, and has no financial interest therein, but offered to give complainant credit at invoice prices of all the old type switches he had on hand. The new switch is from $3.50 to $4 more costly than the old. The contractor sells the switch to the customer and makes a profit. Complainant's profit on the new would exceed that which he made on the old. The new type is now required in a large number of the principal cities of the country. All other contractors of Anniston have complied with the rule, and the new type switch, which has been on the market three years, is growing in general use. The evidence of one witness as to this feature is as follows: "That the type of entrance switch listed in said 'Service Rules and Regulations' is being generally advocated by practically all progressive and up to date utility companies, as well as electrical engineers, and is already in use by a large number of public utility companies throughout the United States and has been so used for the past three or four years."

As we read and understand the record, the foregoing matters appear without substantial conflict in the proof. Likewise upon the question as to the difference between the two types of switches the evidence is in substantial accord.

The new is referred to as the "accessible fuse type switch," which does not require the opening of the door to the switch box to replace a blown fuse, as is necessary in the old type. In the new type a lever operates on the outside of the switch box which blockades a sliding door on the front covering up the fuses and rendering them "dead" and void of danger. This renders fire less likely. Its chief virtue, however, appears from the evidence to be better protection to human life. In the new type there is no danger of a person receiving a shock from replacement of a fuse, while there are possibilities of coming in contact with "live parts" in the old.

The evidence is further to the effect that the theft of electric current has become a matter of serious concern to public utilities, and another advantage of the new type over the old appears to be the fact that the new switch is sealed, and one cannot "jump the current," without breaking the seal, and, if broken, this serves at once as notice that investigation should be had. Thus the theft of current is rendered more readily detected. The sealed switch also serves to give notice to the owner that there is no necessity he go into the switch, and that, if any trouble exists, it should be corrected by an electrician.

█ Further detail discussion as to these advantages need not be indulged. The history of the various advance steps in switches was fully gone into, and numerous witnesses testified as to the advantages of the new over the old type. These witnesses were not contradicted save by complainant in a very general way, and who admitted he had made no particular investigation. Indeed, on cross-ex-

amination he confessed to some superiority of the new over the old, but thought it "very little." These witnesses were examined orally before the chancellor, with demonstrations before him of these two types of switches, and their differentiating features. His finding of fact is to be considered as the verdict of a jury, and not to be disturbed, unless found to be plainly and palpably wrong. Curb v. Grantham, 212 Ala. 395, 102 So. 619.

The chancellor found, as stated in the opinion accompanying his decree, that the enforcement of defendant's rule as to the new type of switch will work no damage to complainant's business, that no restraint of trade is made to appear, and that said new type is available in the general market from several electric jobbers in that territory. The chancellor further concluded that the rule promulgated was a reasonable requirement, saying:

"3rd. That the regulation complained of in complainant's bill is a rule promulgated by the respondent as a precaution, or safety measure, for the protection of both life and property; that said regulation is an advancement in the science of distributing electrical energy, and its effect will be to protect life and property.

"4th. That the regulation requiring the use of the accessible fuse type switch as a condition precedent to the furnishing of electric service to a customer in the city of Anniston is a reasonable regulation, and that the respondent has the right to promulgate and enforce such a rule or regulation."

We are not persuaded the finding of the trial court on the facts is plainly wrong. On the contrary, we are of the opinion his conclusion is fully and amply supported by the evidence. The defendant, as a public service corporation, is obligated, independently of any statute, to treat all members of the public that it has held itself out as serving fairly and without discrimination. Birmingham Ry., L. & P. Co. v. Littleton, 201 Ala. 141, 77 So. 565, 570; Alabama Water Co. v. Knowles, ante, p. 61, 124 So. 96; Tallassee Oil & Fertilizer Co. v. Holloway, supra.

But, as a condition precedent to such service, the applicant must conform to reasonable rules and regulations imposed. This limitation is recognized by all the authorities, and was given application by this court in Birmingham R., L. & P. Co. v. Littleton, supra, wherein it is said: "Service must be asked at a proper time, at a proper place, in proper form, and in a proper manner. That is to say, the applicant must submit to such reasonable conditions as the public service company sees fit to impose." The very question here considered, that is, the requirement of a certain type of switch, was fully considered in an exhaustive opinion by the Vermont Supreme Court in the case of Hawkins v. Vermont Hydro-Electric Corporation, 98 Vt. 176, 126 A. 517, 37 A. L. R. 1359, which sustains in every respect the decree here rendered, as do also the authorities cited in the note thereto. The case of State ex rel. Kansas City P. & L. Co. v. Public Service Commission, 310 Mo. 313, 275 S. W. 940, from the Supreme Court of Missouri, is likewise directly in point, and fully supports the decree rendered. See, also, Tismer v. New York Edison Co., 170 App. Div. 647, 156 N. Y. S. 28. This right of the public service corporation to impose reasonable rules and regulations as a condition precedent to rendition of service is recognized in this state by statute (section 7202, Code 1923), though the authorities generally gave application thereto independently of any statutory enactment. Counsel for complainant in brief recognize this statute, and express the view the case "hinges upon the question as to whether the regulation adopted * * * is a reasonable one." There is suggestion in brief, however, to the effect no rule or regulation in the conduct of its business may be imposed by such public service corporation without first the approval of the Public Service Commission.

We have read the cited statutes, sections 9740 to 9842, but do not construe them as indicating any such limitation upon the express authority recognized in section 7202, above noted. These statutory provisions disclose the power and right of the Public Service Commission to enact rules and regulations binding on such public utilities, and, when so enacted, they become law made rules as held in Alabama Water Co. v. Knowles, supra. But, in the absence of such action on the part of the commission, we find nothing in the statute precluding such utilities from imposing rules and regulations in the conduct of its business, provided, of course, they are reasonable and subject always to inquiry in that respect. We think section 7202, supra, is plainly to that effect, and the other statute indicates no further limitation thereof.

There is some suggestion also that the rule adopted by the commission in 1920 concerning inside wiring is sufficient to embrace the question here considered, but we cannot read the rule as touching the question of type of switch to be used or as intended to affect that question whatever. That rule was merely intended as some form of protection to the owner by way of competent inspection for inside wiring and no more.

Complainant further insists that, as his type of switch met the requirements of the Underwriters' Association, with which the city and its inspector were likewise satisfied, that was the conclusion of the matter, and further inquiry as to the reasonableness of the rule imposed was unnecessary. But the Underwriters' Association was interested primarily in protection of property from fire, likewise of interest from the city's stand-

point. Very clearly, this does not preclude the utility from the exercise of its right and duty to the public to adopt improved methods or instrumentalities intended for the better protection not only of property but of human life as well. It appears, therefore, that after all the case hinges upon the reasonableness of the regulation imposed, which question has been determined favorably to defendant by the chancellor following full hearing on oral proof amply supporting his finding.

We find no reason to disturb his conclusion. The decree on motion to dissolve is separate from the final decree, a short lapse of time intervening, but both hearings were upon the same evidence heard in the same manner. It is clear, therefore, that in the instant case a conclusion of fact that would sustain one decree would likewise sustain the other, and separate treatment is deemed unnecessary. We may add, however, that some authorities noted as denying a consideration of defensive matter on hearing of motions to dissolve an injunction have been superseded by statute. Section 8311, Code 1923.

■■ The order of the chancellor requiring increased injunction bond is reviewable on the appeal from final decree, and properly here assigned as error. The bond, on motion of defendant, was increased from three hundred to five hundred dollars. Defendant had alleged that the expense of the suit including attorneys' fees incurred would exceed one thousand dollars. The motion was sworn to, and no contradictory proof was offered. Under these circumstances, therefore, this court would not be justified in disturbing the order made.

It results that the decree of the court below will be here affirmed.

Affirmed.

ANDERSON, C. J., and BOULDIN and BROWN, JJ., concur.