178 So. 21

### AMERICAN NAT. BANK & TRUST CO. v. POWELL et ux.

**I Div. 966.**

Supreme Court of Alabama.

Dec. 16, 1937.

Rehearing Denied Jan. 20, 1938.

238

Inge, Stallworth & Inge and Thos. A. Hamilton, all of Mobile, for appellant.

Mahorner & Mahorner, of Mobile, for appellees.

240

KNIGHT, Justice.

The bill in this cause was filed by complainant, appellant here, against the respondents, Oliver H. Powell and Violet D. Powell, husband and wife, and seeks to have certain transfers of property by the husband to the wife set aside and canceled, as being fraudulent and void as against the claims of complainant, an existing creditor.

It appears from the averments of the bill that the complainant, a banking institution in the city of Mobile, loaned to the respondent Oliver H. Powell on the 17th or 18th day of March, 1930, on his unsecured promissory note, $28,000. On the day the loan was made, and as a basis of credit, the respondent Oliver H. Powell submitted to the complainant a statement in writing which purported to show the property holdings, at the time, of said respondent, the value of the same in detail, and amount of his liabilities. This statement showed that the total assets of said respondent were at that time, March 17, 1930, $363,306, with aggregate liabilities of $14,090, leaving net worth of $349,216. Listed as assets:

Cash in Banks ...............$20,050.00
Liberty Bonds ............... 20,000.00
Partnership interest in
Powell Barge Co....$166,072.00
Staples-Powell Real-
ty Co. ..........  17,804.00
                      _____
                       183,876.00
Stocks ..................... 139,380.00

The said respondent also represented that he had life insurance payable to his estate in the sum of $25,000.

It further appears from the bill that the said respondent made some payments on his said indebtedness, so that on March 3, 1932, there remained a balance due on this transaction to complainant of $20,000; that on March 7, 1932, after the maturity of said note, and while there remained a balance due thereon of $20,000, the said respondent gave complainant another statement showing himself insolvent to the extent of $5,309.35. This second statement showed cash $886.65, and did not show the Liberty bonds, nor the stock listed in the first statement as being worth $139,380. It showed the value of the interest of said Powell in the Powell Barge Company to be $25,000 instead of $166,072. It also showed that the insurance, instead of being payable to his estate, was in fact payable to his wife, the said Violet D. Powell.

It also appears from the bill that the complainant on February 23, 1933, recovered a judgment against the said Oliver H. Powell on said note in the sum of $19,743.73, and which remained wholly unpaid.

The bill then charges that the stock listed in his (Powell's) statement to the complainant, when the loan was made, at $139,380, and which was stock in the Powell-Feeks-Duval Realty Company, had been transferred to the respondent Violet D. Powell, and that such transfer "was made for the purpose and with the intent to hinder, delay and defraud his creditors, and was voluntary and without any valuable considerations, or if complainant is mistaken as to the consideration, then for an insignificant and wholly insufficient consideration, and that the respondent Violet D. Powell accepted the same with the same purpose and intent."

The same charge was made with respect to the transfer to his said wife of the Liberty bonds, and his interest in the Powell Barge Company. And the same charge was made with reference to the change in the beneficiary of the life insurance policy.

The bill then contains the further omnibus charge: "Complainant further alleges that all of the aforementioned transfers and assignments were voluntary and void and in fraud of complainant's rights."

In their answer, the respondents admit that the complainant on March 17th or 18th loaned the said respondent Oliver H. Powell the sum of $28,000, as charged in the bill; that a large part of this indebtedness still remains unpaid; that on February 23d, 1933, the complainant recovered a judgment on the note evidencing said indebtedness for $19,743.73, and that this judgment remains wholly unpaid.

The respondents, in their answer, admit, also, that the said Oliver H. Powell had

transferred the stock (Powell-Feeks-Duval Realty Company), and his interest in the Powell Barge Company to his wife after his indebtedness to the complainant had been contracted, and the liability therefor had been incurred. The respondents insist, however, that the transfers were, in each instance, supported by a sufficient valuable consideration moving from the wife to the husband, and they deny that said transfers were made in fraud of any rights of the complainant, or that the respondents, or either of them, in making or accepting said transfers, intended to hinder, delay, or defraud the complainant in the collection of its indebtedness. In short, they assert that said transfers were made in good faith, supported by sufficient valuable considerations, without fraud or collusion, or the semblance of either, and were, therefore, valid.

At hearing, the respondents amended their answer by adding thereto the following: "And respondents further allege that the Twenty-eight thousand Dollar ($28,000.00) note of Oliver H. Powell dated March 17th, 1930, was reduced by payments made by him and renewals given for the balance due from time to time up to the 14th day of December, 1931, in the sum of $22,500.00, and that on, to-wit, the 3rd day of May, 1932, the respondent Oliver H. Powell affected a new agreement with the complainant for the payment of said $22,500.00 note by paying $2500.00 cash on account of same and giving to complainant a new note for $20,000.00 secured by mortgage on the undivided interest of said Oliver H. Powell in that real property in the City and County of Mobile, Alabama, situated at the Northeast corner of Royal and St. Michael Streets and known as the Staples-Powell Building. And respondents allege that this agreement for the payment of $2500.00 cash and the substitution of said $20,000.00 note secured by the aforesaid mortgage, was pursuant to an agreement with complainant by the respondent Oliver H. Powell after full knowledge on the part of complainant of all of the facts alleged in the bill of complaint, therein alleged to have existed prior to the date of said mortgage."

Upon final submission, the court dismissed the complainant's bill, holding that the transfers were supported by substantial and valuable considerations, and that there was "no intent on the part of *Violet D. Powell* to defraud, hinder or delay the complainant in collecting its debt."

■ The testimony was given ore tenus before the court, and we must, therefore, accord to the judgment of the trial court the same weight and effect that we would give to the verdict of a jury, and must not disturb the court's conclusion on the evidence unless it is plainly erroneous. Jackson v. Jackson, 204 Ala. 257, 85 So. 482; Fitzpatrick v. Stringer, 200 Ala. 574, 76 So. 932; Curb v. Grantham, 212 Ala. 395, 102 So. 619, and Wiegand v. Alabama Power Co., 220 Ala. 620, 127 So. 206.

■ While we have steadfastly held to the above rule, on appeals to this court, where the evidence was given ore tenus, nevertheless we have, with equal tenacity, held that "This court has not renounced its duty nor neglected its power to revise the verdicts of juries and the conclusions of trial judges on questions of fact, where, in our opinion, after making all proper allowances and indulging all reasonable intendments in favor of the court below, we reach a clear conclusion that the finding and judgment are wrong." Twinn Tree Lumber Co. v. Day, 181 Ala. 565, 569, 61 So. 914, 915, Carraway v. Graham, 218 Ala. 453, 118 So. 807, 811, and Columbus Elec. & Power Co. v. Downs, 214 Ala. 104, 105, 106 So. 593.

■ On this appeal, therefore, we are required to review, and consider for ourselves, the evidence offered upon the hearing, and determine whether, after making all reasonable allowances and indulging all reasonable intendments in favor of the court below, we are clearly of the opinion that the finding and judgment of the trial court are wrong. In doing this, the court is solemnly enjoined to "proceed with great caution; but it should leave no evident mistake unrighted." Carraway v. Graham, supra.

■ We need not consider here any question as to the fraud charged in the transfer of the Liberty bonds, or as to the insurance policy, as the appellant has abandoned this phase of its case.

This abandonment of any claims against the Liberty bonds and the life insurance policy narrows our consideration to two items, viz., the alleged fraudulent transfers of the stock in the Powell-Feeks-Duval Realty Company and the interest of the respondent Oliver H. Powell in the Powell Barge Company. However, we shall be forced to make some references to the Liberty bonds in the discussion of the case as made by the evidence.

The contention of the respondents is, that the true consideration paid by Mrs. Powell for the stock in the Powell-Feeks-Duval Realty Company was (a) a note of Mrs. Powell, given to her husband for $4,000, and (b) the cancellation to extent of $14,000 of an alleged antecedent debt due by the husband to her, thus making this purchase price paid $18,000.

It is also insisted by the respondent that the consideration paid by Mrs. Powell for a one-third interest of her husband in the Powell Barge Company was $13,218.89, and that the purchase price was paid by note of Mrs. Powell, executed to her husband, for $2,000 and the cancellation to the extent of $11,218.89 of an alleged antecedent debt due by Mr. Powell to his wife. Just what antecedent debt, if any in fact, these cancellations were applied to will later be reviewed and discussed—whether there was, in fact, any antecedent debt to which such applications could be made is one of the main contentions in this case.

The testimony leaves no room to doubt but that the original loan made to the respondent Oliver H. Powell was made upon a fraudulent misrepresentation of his financial condition. In this statement he represented that he had in banks, *in cash,* $20,000.

This representation was in fact false and fraudulent, and was, no doubt, made not only to swell his assets, but to increase and magnify his credit standing.

We have said that the testimony leaves no room to doubt that the inclusion by Powell of the cash item of $20,000 as a part of his assets, as listed with the complainant, was for the false and fraudulent purpose of swelling his assets, and also for the purpose of increasing and magnifying his credit standing. We are entirely justified in making this statement, as it abundantly appears from the evidence that the Powell-Feeks-Duval Realty Company, managed almost exclusively by the respondents, borrowed from the First National Bank of Mobile on March 15, 1930, $28,000. Twenty thousand dollars of this money was almost immediately drawn out, and by successive checks applied to the credit of Oliver H. Powell in said bank. And after this loan was consummated with the complainant bank, this $20,000, which came into the personal bank account of Oliver H. Powell, was withdrawn and returned to Powell-Feeks-Duval Realty Company, or applied to the payment of their notes in the said First National Bank of Mobile. Mr. Powell has attempted to explain this transaction but his explanation is wholly unsatisfactory. His deposit account of $20,050 was built up for no other purpose than as above stated.

When the bank was calling Mr. Powell in March, 1932, for settlement of the note, Mr. Denniston had succeeded Mr. Imahorner as president of complainant bank. The complainant then called for a statement of the then financial condition of Mr. Powell. This statement showed Mr. Powell was at that time insolvent.

It was then insisted by Mr. Powell, for the first time, that the Liberty bonds were included by error of Mr. Curran, the respondent's auditor, in the first financial statement submitted to complainant for basis of the loan of $28,000. Mr. Powell then claimed that the Liberty bonds were the property of his wife, given to her by her sister, and had never been his property. That the life insurance, listed as being payable to his estate, was also included by mistake of Mr. Curran, respondent's auditor. However, the statement was signed by Mr. Powell, and Mr. Curran testified that he got his information from the books and by "interrogating" Mr. and Mrs. Powell. We do not doubt the source of the information, nor do we doubt from the evidence that both respondents were fully informed as to the contents of the statement. We include Mrs. Powell in this statement for she had entire charge of the office work; knew what was going on at all times in the office. We are fully persuaded by the evidence that both respondents were involved in this false and fraudulent transaction, not simply Mr. Powell.

It will be noticed that said statement limited the then liabilities of Mr. Powell to the aggregate sum of $14,090, and not one word or hint is given that Mr. Powell owed his wife $60,000, or any part of it.

At all events, when the depression, in all of its force, came on, the respondents made haste to seek shelter. And how did they seek it? To our mind the conclusion is unescapable that they seized upon the idea of making the transfers now attacked.

We have read with the greatest care every line of evidence found in this record. No one can read the evidence of the respondents and reach the conclusion with any degree of satisfaction that the facts are as they detail them.

That there were $20,000 in Liberty bonds is a fact. To whom did they in reality belong is still a matter of speculation. We are inclined to believe that they belonged to Mrs. Feeks, a sister of Mrs. Powell, and that the sister and brother-in-law were allowed to use them at times as collateral. However, since the complainant has abandoned its attempt to reach and subject the bonds to the payment of its debt, the question of their real ownership has, in part, become moot. But yet they will again figure in this case.

■ It is insisted that the transfer to the wife of the stock owned by the husband in the Powell-Feeks-Duval Realty Company was supported by a sufficient, valuable consideration, and, as the transferree, Mrs. Powell, had no knowledge of, and did not participate in any fraudulent scheme on the part of the husband, her acquisition of the stock must be protected. Exactly so, if the evidence supported this contention.

The same contention is made with reference to the transfer by the husband to the wife of his interest in the Powell Barge Company.

We have heretofore told just how Mrs. Powell claims to have paid for this stock and property interest.

It is insisted that Mrs. Powell borrowed of the First National Bank of Mobile sundry amounts of money, aggregating some $20,000, and that the loans were evidenced by the notes of Mrs. Powell, and that on October 14, 1926, these several loans were consolidated, and one note for $20,000 to cover the aggregate of the loans was given the bank by Mrs. Powell. This note was secured by $20,000 of Liberty bonds. It is the contention of Mrs. Powell that she loaned this money to her husband to finance his purchase of an interest in the Staples-Powell Building Company, and in connection with his operation of the Staples-Powell Lumber Company. This we may assume to be true.

But the record discloses that within a year, or two years, at most, thereafter, Mr. Powell repaid these amounts to Mrs. Powell by his checks on the First National Bank of Mobile. The evidence indisputably shows that this money was paid back to Mrs. Powell long before the transaction with the complainant took place. The respondents made the further claim that her husband, prior to May 22, 1919, had become indebted to her in the sum of $60,000.

The only evidence in support of this contention offered by the respondents was a promissory note purporting to have been given to Mrs. Powell on May 22, 1919. The bona fides of this note is challenged by the complainant.

The statement filed with complainant wholly failed to mention any indebtedness due and owing by Mr. Powell to his wife. On page 490 of the transcript it appears that Mr. Powell testified:

"Q. And yet you say that although on March 17th, 1930 (Date of complainant's loan) you filed a statement showing a net worth of $349,216.00, you now say you haven't anything? A. No sir."

"Q. What became of it? A. Well just like everybody else.

"Q. How did it happen? What caused it to get away from you? A. Well, several things.

"Q. What are they? A. A lot of charitable things.

"Q. You did not give away $349,210.00, did you since March 17, 1930? A. No, sir, we lived high like every body else."

"Q. You spent $349,000.00 in living since March 17, 1930? A. That, and what I paid my wife.

"Q. How much did you pay her? A. About thirty or forty thousand dollars.

"Q. What did you pay her that for? A. On the Powell estate.

"Q. The statement does not show you owed her a cent? A. Not at that time though.

"Q. How did you become indebted to her? A. I owed her from the Staples-Powell Lumber Company.

"Q. You do not show in this statement that you owed any thing. You do not mean to say that you filed a statement for the purpose of borrowing money from the Bank, and yet that statement did not show any of your liabilities? A. It does show what I owed.

"Q. It shows notes payable and endorsements $13,450.00. That was a note held by the First National Bank, endorsed by you and Mr. Staples, was it not? A. Yes sir.

"Q. You did not pay that out of what you received from the sale of the Powell-Barge Co.? A. No."

■ We cannot credit the rather remarkable statement made by Mrs Powell in explanation of how she acquired the $60,000, which she claimed she loaned her husband

244

from 1911 to 1919. Mr. and Mrs. Powell married in the year 1911, and at that time Mrs. Powell was only 17 years of age. She testified that she made $60,000 prior to her marriage, in selling newspaper clippings in the city of Mobile; that she made this money in one year. The account given by her of how she made, and kept, this money is so unreasonable that we cannot for a moment credit her statement. The note, in our opinion, is wholly without consideration. The evidence forces us to the conclusion that, at the time Mr. Powell made the transfers, he owed his wife nothing.

The evidence shows that on April 7, 1930, less than a month after Mr. Powell borrowed the $28,000 from the complainant bank, on his open, unsecured note, he transferred his stock in the Powell-Feeks-Duval Realty Company to his wife, and on June 1, 1931, he transferred his one-third interest in the Powell Barge Company to his wife. The evidence leaves no room to doubt that each of these transfers was executed for the purpose of placing the property beyond the reach of creditors, particularly the complainant. That Mrs. Powell knew of the fraudulent scheme and participated therein we entertain no sort of doubt.

The only consideration that the evidence shows that Mrs. Powell in fact paid, if she paid anything, for the transfer of stock in the Powell-Feeks-Duval Realty Company was by her promissory note for $4,000. The alleged cancellation of a part of an antecedent debt for the balance of the purchase price cannot be considered as a payment on the stock, for the very obvious reason that there was no such antecedent debt.

■■■ There being no antecedent debt, we must decide the case as if the only consideration paid, or agreed to be paid, was the note for $4,000 given by the wife to the husband. This, then, was a new consideration, not resting on past indebtedness. In these circumstances, the burden, in the first instance, was on the complainant to show that its debt antedated the transfer. This the complainant has done. When this was done, the burden was then upon Mrs. Powell, the grantee, to show that she paid a valuable consideration—substantial and not merely nominal. This we may assume she has done. And if there was no other evidence in the case we would not be justified in holding the transfer fraudulent and void. However, apart from the grossly inadequate price paid, or agreed to be paid for the stock, we are clearly convinced that Mrs. Powell had

notice that her husband's intent in making the transfer was to hinder, delay, and defraud his creditors, by placing his property beyond their reach. Therefore, we are clearly of the opinion that, under the decisions of this court, we must and do hold the transfer of the stock in the Powell-Feeks-Duval Realty Company to be fraudulent and void as against the creditors of Mr. Powell. London v. G. L. Anderson Brass Works, 197 Ala. 16, 72 So. 359; Federal Land Bank of New Orleans v. Rowe, 222 Ala. 383, 133 So. 50; Buell v. Miller, 224 Ala. 566, 141 So. 223, and Tyson et al. v. Southern C. Oil Co., 181 Ala. 256, 262, 61 So. 278, 280.

What we have said in condemnation of the transfer of the stock in the Powell-Feeks-Duval Realty Company, applies to the transfer of his interest in the Powell Barge Company. We are of the opinion this transfer was fraudulent and void as against the creditors of the respondent Oliver H. Powell.

■■■ These transfers being void for actual fraud, as stated above, they will not be permitted to stand for any purpose. Ruse v. Bromberg, 88 Ala. 619, 629, 7 So. 384, Pritchett v. Jones, 87 Ala. 317, 6 So. 75, and Buell v. Miller, supra.

It is further insisted by the appellees that, even if it should be held by this court that the transfers were fraudulent and void, that the complainant is in no position to assert the same, for that it knew, or should have known, on May 3, 1932, when it accepted the new note and a mortgage securing the same from Mr. Powell, of all of the facts and circumstances of which they complain in this action.

We find no evidence in this record which shows or tends to show that at the time the extension agreement was entered into that the complainant had notice, or knowledge, of the facts and circumstances complained of in this suit. Nor is there evidence in this record which shows, or tends to show, that at the time of the execution of the renewal note, and the mortgage, that the complainant had any notice or knowledge that the respondent Oliver H. Powell had conveyed or transferred to his wife any part of his property, nor is there any evidence in the record to show, or that tends to show, that the complainant knew anything whatsoever of the claimed indebtedness of the husband to the wife, as is brought forward in this suit, and claimed as the major part of the real consideration for the transfers. To

the contrary, the bank had before it the written statement of March 17, 1930, in which no such indebtedness is shown, or even hinted at.

While the president of the bank testified, in substance, that his "suspicions" had been aroused by the circumstance that the respondent Powell showed assets of more than $300,000 on March 17, 1930, and in less than two years thereafter was insolvent, $5000, during all the negotiations between the complainant's president, Mr. Dennison, and the respondents, or by either of them, no mention, nor even suggestion, was made that the husband had conveyed or transferred his property to his wife. There had been, so far as this record discloses, no physical change in the possession of any of the properties. And, here, we may say that it required an examination in court, in a proceeding for discovery, to bring out the real facts in regard to the said transfers. It was after this examination that the bill was filed. All knowledge of the conveyances or transfers was securely locked within the breasts of the respondents, and it nowhere appears that the complainant, or any of its authorized agents, had any notice or knowledge of such transfers at the time of the execution of the extension note.

▆ We are fully aware of the rule of law that a conveyance in fraud of creditors made with the *full knowledge* of existing creditors is valid, as far as the creditors who assent to or affirm the conveyance are concerned. 27 Corpus Juris, p. 481, § 130. Mere notice of a fraudulent conveyance without any action on the part of the creditor will not amount to a confirmation, and it is only when, with notice of the fraud, either actual or constructive, the creditor agrees upon consideration to confirm it, or makes any statement or agreement to that effect, upon the faith of which the grantee acts as he would not otherwise, or if the creditor acts in such manner that the subsequent assertion of his rights, as creditor, if permitted, would be a fraud, that he will be held to have assented to or ratified the transaction. Bump on Fraudulent Conveyances, § 456; Robins, Fry & Co. v. Wooten, 128 Ala. 373, 30 So. 681.

In the case of Proskauer v. People's Savings Bank, 77 Ala. 257, in which the effort was made to set up an estoppel against a creditor in asserting that a conveyance was made in fraud of creditors, it was observed: "Acts or admissions *en pais,* in order to operate an estoppel, must have influenced the conduct of the party setting them up, or alleging them as an estoppel. It *can not be seriously contended,* that the delay of a creditor to pursue property alleged to have been fraudulently conveyed, for two or three years, in the meantime making efforts to secure or obtain payment of his debt otherwise, estops him from assailing the first, or a supervening fraudulent conveyance, and seeking to subject the property to the payment of his demand; or that he is estopped by renewals of the debt, and accepting the grantee as an indorser, when such indorsement is not made, with the *knowledge of the creditor,* on the faith of such conveyance having been executed." (Italics supplied.)

▆ And in 27 Corpus Juris, p. 481, § 13, the author states the rule broadly as follows: "* * * But to estop the creditor from setting up fraud in a conveyance of all his property by the debtor, the holder of the property must allege and prove that the creditor knowing the purpose of the conveyance assented to it, and that such assent induced him to accept."

But the insistence of appellees is that the agreement of May 3, 1932, was a novation, and precludes any relief to appellant.

▆ The evidence wholly fails to show any novation. As said in Montgomery Bank & Trust Co. v. Jackson, 190 Ala. 411, 67 So. 235: "An essential factor in novation is the discharge from liability, under the original contract, of him who is bound by the original obligation of which novation is asserted. The 'extinguishment of the old contract' must be a result of the new, independent contract. 29 Cyc. pp. 1130, 1131, 1133–1136; McDonnell v. Alabama Gold Life Ins. Co., 85 Ala. 401, 410, 413–415, 5 So. 120. Whether in a given case this essential feature, viz., substitution of a new contract for the old, was present, is a question of intention, to be deduced from the facts and circumstances. McDonnell v. Alabama Gold Life Ins. Co., supra; 29 Cyc. pp. 1134, 1135."

▆ There can, of course, be no waiver without knowledge or means of knowledge of all material facts, and there can be no acquiescence or ratification without full knowledge or means of knowledge of all material facts. 27 C.J. p. 481, § 130.

▆ The delivery or surrender to the maker of the note upon its being renewed does not in itself raise a presumption of its

extinguishment by the new; it being considered as a conditional surrender, and that its obligation is restored and revived if the new note be not duly paid. Anniston Loan & Trust Co. v. Stickney, 108 Ala. 146, 19 So. 63, 31 L.R.A. 234, and Crocket v. Trotter, 1 Stew. & P. 446.

The contention of appellees that the complainant assented to, or affirmed the fraudulent transfers, or that by its conduct it is estopped from assailing the conveyances or transfers for fraud, or that there was a novation and extinguishment of the old obligation, is without support in the evidence. We will, therefore, refrain from a further discussion of this contention.

It is next insisted that, if the court should find that the conveyances or transfers were fraudulent, no personal decree can be rendered against Mrs. Powell for the value of such of the property as she may have sold.

Of course, so long as the property remains in the possession of the fraudulent grantee, she, it would seem, is not subject to a personal judgment, in a court of equity, in favor of the creditors of the grantor. The proper course is for such creditors to pursue the property and fasten their lien thereon. But the fraudulent grantee occupies the position of trustee and is liable to account therefor as a trustee for such creditors. The trust is imposed by law, and is imposed on the donee in invitum. Bryant v. Young, Hall et al., 21 Ala. 264, Lockard v. Nash, 64 Ala. 385, and Dickinson et al. v. National Bank of Republic, 98 Ala. 546, 14 So. 550.

If the grantee, law imposed trustee, has disposed of the property, a court of equity will require her to account therefor, and, to the extent necessary to satisfy the pursuing creditor's claim, such grantee will be held liable for the full value of the property recovered by him, regardless of what he may have paid for it. 27 C.J. 669, 855; Cottingham v. Greely Barnham Grocery Co., 129 Ala. 200, 30 So. 560, 87 Am.St.Rep. 58; Dickinson et al. v. National Bank, etc., supra; Muskegon Valley Furniture Co. v. Phillips & Bro., 113 Ala. 314, 21 So. 822, and Bryant v. Young, Hall et al., 21 Ala. 264, supra.

And it seems to be the general rule that the fraudulent grantee, if he has sold the property, must account for its fair and reasonable value at the time and place he received it, with interest. Muskegon Valley Furniture Co. v. Phillips & Bro.,

supra. Of course, for the ascertained value of the property a personal decree may be entered against such grantee, at least to the extent necessary to satisfy the pursuing creditors' claims. Dickinson et al. v. National Bank, etc., supra.

But it is urged that Mrs. Powell is a married woman; that the conveyances were made to her by her husband, and that even if they are adjudged to be fraudulent and void, no personal decree, for the value of the property sold and disposed of by her, can be rendered against her. In support of this proposition the appellees cite Phipps v. Sedgwick, 95 U.S. 3, 24 L.Ed. 591, United States Trust Co. of New York v. Sedgwick, 97 U.S. 304, 24 L.Ed. 954, and Huntington v. Saunders, 120 U.S. 78, 7 S.Ct. 356, 30 L. Ed. 580.

Learned counsel for appellees seem to have overlooked the fact that the common-law rule as to the property status of the wife, her capacity to contract, and her liability for torts committed by her, was long since abrogated in this state. All property of the wife is now her separate property, she has full legal capacity as if she were sole, except as otherwise provided. She may not become the surety of her husband, and cannot sell or alien her real estate except as provided in section 8269 of the Code. She is liable for her debts and for her torts. In short the headsman's axe long since descended upon the trusteeship of the husband. Code 1923, §§ 8261, 8266, 8267 and 8269.

The authorities cited by appellee's counsel have no application in this jurisdiction, under our statutes defining the rights and liabilities of a married woman. Coverture, here, furnishes no protection for the wife when sued on her contracts, or for her torts.

If the fraudulent grantee has disposed of the property, or any part of it, she may be forced to account for the reasonable value thereof at the time and place she received it, and a personal judgment may be rendered against her therefor, the same as if she were not the wife of the grantor. Sexton v. Wheaton, 8 Wheat. 229, 240, 5 L. Ed. 603; 2 Moore on Fraudulent Conveyances, p. 680; Sheldon v. Parker, 66 Neb. 610, 92 N.W. 923, 95 N.W. 1015; Phelps v. Smith, 116 Ind. 387, 17 N.E. 602, 19 N.E. 156; Bigby v. Warnock, 115 Ga. 385, 41 S. E. 622, 57 L.R.A. 754.

It is also urged by appellees that the fact that the debtor, and his wife, and some of

their family offered to secure the debt to the bank by hypothecating the realty company's holdings, which were owned by Mrs. Powell, Mrs. Feeks and Mr. Duval, shows that there was no purpose on the part of Mr. and Mrs. Powell to defraud the complainant. This property was valuable, to be sure. But the debtors wanted to make such terms as were satisfactory to them. They insisted upon a long-term loan, through several years. The bank was in no position at that time to make such an extension, or to take such paper. This the president of the bank told the parties. He also told them that the matter could be arranged so that another company would take the loan, but that a bonus of $1000 or 5 per cent. brokerage charge would have to be paid, and that the interest rate would be 7 or 8 per cent. It is clear, however, that this fee was not for the benefit of complainant, but to pay brokerage charges in getting some other concern to take the mortgage off the hands of the bank. Mr. Denniston made it clear, we think, that due to the depression, and shrinkage in deposits, the bank could not take a long-term mortgage.

However, we are fully persuaded that it was not solely a desire to secure the debt that prompted the appellees to offer this security, but we are inclined to believe that fear of the consequences of the false statement given the bank when the loan was made, had some stimulating influence upon the action of the parties. At all events, it is certain that the security was to be offered only on terms laid down by the appellees. A creditor will not be held to be estopped from assailing a fraudulent conveyance because of the offer by debtor of security on debtor's own terms, and its refusal by the creditor, nor is such an offer competent evidence to disprove fraud in the execution of the conveyances.

We have discussed herein all matters pressed upon our attention by appellees in support of the decree of the circuit court, which, in our opinion, approach merit. We are clearly of the opinion that the trial court erred in dismissing the complainant's bill, and in not holding the transfer by Mr. Powell to his wife, Violet D. Powell, of the stock in the Powell-Feeks-Duval Realty Company, and the conveyance of Mr. Powell to his said wife of his interest in the said Powell Barge Company, to be fraudulent and void as against the claim of the complainant. The decree of the circuit court will be reversed, and a decree will be here rendered holding said transfers fraudulent and void as against the claim of complainant, and remanding the cause for such other and further proceedings and decrees, in conformity with this opinion, as may be proper and necessary in the premises.

*Reversed, rendered, and remanded.*

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.